[Crim. No. 4592.   First Dist., Div. One.   Sept. 23, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. EDDIE FRANKLIN BARRY, JR., Defendant and Appellant.

J. Tony Serra, under appointment by the District Court of Appeal, and George Yamasaki for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., and Jackson L. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—On this appeal from a judgment after conviction by a jury of grand theft defendant's sole contention is that certain statements made by him to the police were introduced into evidence in violation of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. ▮▮▮ We have concluded that while defendant's statements were obtained in violation of his rights under *Dorado,* their admission into evidence did not constitute prejudicial error so as to require a reversal of his conviction. Before turning to the statements themselves, however, we concern ourselves with the evidence, aside from defendant's statements, contained in the record in support of defendant's conviction.

For approximately one month prior to January 2, 1963 defendant had been employed as night clerk or night auditor at the Oakland Inn in Oakland. In this capacity, defendant's working hours at the Inn were from 11 p.m. to 7 a.m. After about 2 or 2:30 a.m. the only other persons working on the premises were three men who performed janitorial services in the bar, restaurant and kitchen areas, which were some distance from the office in which defendant was stationed during his working shift. Defendant's duties as night clerk gave him access to various moneys belonging to the Inn consisting of (1) a locked change box which contained $1,200 in change and currency and which could be opened with a master key used in conjunction with another key, defendant having access to both keys and authority to open this box during his work-

ing hours, and (2) a bank used by defendant containing $300 as a change fund plus any money which he took in while on duty. This last-mentioned bank was located in one of four desk drawers in the Inn office and was accessible only to defendant and the controller, they being the only persons possessing a key to this drawer.

In addition to these two sources of money to which defendant had access in conjunction with his employment, there were in the Inn office the following other places where money was kept: a ''drop safe'' into which envelopes containing the Inn's daily cash receipts were deposited; three other desk drawers used as banks by the three other persons who worked as clerks at the Inn; and various safe-deposit boxes, some of which contained valuables belonging to the guests of the Inn and others of which were used as banks by the bartenders and cashiers at the Inn. The ''drop safe'' could be opened with the master key (the same key which in conjunction with a second key opened the change box) in conjunction with a key possessed only by the controller and the bookkeeper, who were the only persons authorized to enter the safe. As for the three desk drawers, each of these at all times contained $300 in change and could be opened only by a key which was held by the clerk who used that particular drawer as his bank and by the controller. No other person, including defendant, had authority to open these drawers. Each safe-deposit box could be opened with the master key in conjunction with a second key which was held by the particular person whose money or valuables were kept in the particular box and by the controller, who possessed a duplicate of this key.

William Palmer, who was office manager of the Inn during December 1962 and January 1963, testified that he was called to the Inn between 4 and 5 a.m. on January 2, 1963; that the door to the office was locked; that defendant, who had been on duty that night, was gone, and his car, a green 1955 Mercury station wagon, was also gone from the premises; that later that morning, when the controller, Gerald Wangsness, arrived at the Inn, it was discovered that the $1,200 kept in the locked change box was missing; that the drop safe, which that night had contained $500 as an extra change fund, plus envelopes containing a total of $1,057.04 in currency, was empty; that the $300 from each of the four desk drawers had been taken, the locks on two of the drawers belonging to clerks other than defendant having been broken; and that at this time it was also discovered that there were five extra keys

which, in conjunction with the master key, opened the drop safe, these keys having been found in the change box.

Sergeant Welch from the Kern County Sheriff's Office then testified to the effect that on January 12, 1963 he found a 1955 Mercury station wagon bearing defendant's license plate number in a shopping center parking lot in Bakersfield, and that the car had been there and had not been moved for several days. Deputy Sheriff King, who was subsequently sent to further check the car, testified that under the front seat of the car he found a paper bag containing between 6 and 10 empty envelopes, which had been torn open, and which bore the label "The Oakland Inn."

Defendant took the stand in his own defense and testified that while he was on duty at the Inn on the morning of January 2, 1963 he had been forced at gunpoint to remove the money from the drop safe, the change box, and the four desk drawers by two assailants, one of whom, Defayette Holloway, he recognized as the night janitor at the Inn, who had also been a guard at San Quentin Prison while defendant was serving a term there; that the two men forced him to drive in his car a short distance from the Inn and then departed; that because defendant was an ex-convict on parole and because Holloway had made various threats to him, he was afraid that no one would believe his version of how the robbery occurred, and he therefore fled in panic, driving to Bakersfield where he left his automobile, and eventually ended up in Chicago where he was subsequently arrested.

In rebuttal, the prosecution presented the testimony of Holloway and his wife, the former testifying that he had no connection with the crime and that he had been at home during the entire evening in question, his wife corroborating his testimony as to his activities on that evening.

In cross-examining defendant, the prosecution confronted him with various extrajudicial statements which he had made prior to trial. These statements, while basically consistent with defendant's testimony that he had been robbed by two men while he was on duty on the night in question and had then fled in fear of being disbelieved, did contain a number of discrepancies from defendant's courtroom testimony as to the manner and mode of his flight and his activities subsequent to fleeing. The first of these statements was taken from defendant by the district attorney while defendant was in jail awaiting trial. The statement itself was not introduced into evidence. However, upon the request of the district attorney,

defendant, at the trial, read aloud a portion of this statement containing a description of one of the assailants. This description was more detailed than that previously given by defendant when he was asked on cross-examination to describe the man who he claimed assisted Holloway in the robbery. Defendant had at that time stated that he could only describe Holloway's companion as a Negro about defendant's size and height. In his extrajudicial statement defendant had, in addition, described the man's clothing, and had stated that he wore a cap, and that he had a handkerchief over his face.

Defendant's second statement, which was not introduced into evidence but was utilized by the prosecution in the same manner as the first statement, was made by defendant to Inspector Page of the Oakland Police Department while defendant was in the custody of the police in Chicago following his arrest. This statement was identical in many respects to defendant's testimony at the trial. The two, however, were inconsistent as to some of the details of defendant's flight. In his statement to Page, defendant stated that he "started driving South. I kept going until I got to Burbank, where I abandoned the car after awhile. . . . I then went to L.A., I think then to New Mexico, Arizona, Texas, to Mexico, then up here to Chicago. I had bought an MG after I abandoned my car. I got the money by borrowing $1000 from a girl friend in Burbank and I had about $700 when I left Oakland. My father had sent me $300 to go back to see him—" On direct examination, however, defendant stated that he drove to Bakersfield, abandoned his automobile, and ultimately ended up in Chicago; and on cross-examination he testified that from Bakersfield he drove to Los Angeles with a man named Terry; that he then drove to Arizona and to Texas in a 1958 MG; and that he subsequently went to Mexico. Concerning the MG, defendant testified on cross-examination that he got it in Los Angeles; that it was Terry's; that Terry paid $1,100 for it; that Terry did not go with him to Arizona; that his purpose was to go to Dallas, Texas, to deliver the MG to a party there; that Terry knew where he was going; and that he did go to Dallas but was unable to contact the party to whom he was to deliver the car.

When confronted on cross-examination with the discrepancies between his courtroom testimony and his statements to Page, defendant testified that certain of the extrajudicial statements did not accurately report what he had actually told Page and that he did not remember having made the others.

While in the county jail, defendant had a conversation with Bernard Davis, his parole officer, the contents of which Davis testified to at the trial when called as a rebuttal witness. Davis stated that defendant told him that two bandits "took the money and him about a mile away from the motel" where they left him; that he walked back to the motel where his own car was parked; that he became panicky because the police might not believe him, so he "took off" for Bakersfield; that he told his wife he was leaving the car there; that he then went to Durango, Mexico, where he did some private tutoring, and that from there he then went to Chicago, where he attempted suicide by cutting his wrists, and ultimately gave himself up to the Chicago police. To the extent that this statement was inconsistent with defendant's testimony on direct examination, specifically, insofar as defendant on direct examination had testified that his assailants forced him to drive them from the motel in his own car and that he was unable to reach his wife by telephone from Bakersfield, defendant, when questioned on cross-examination about his statements to Davis, denied having made them.

Turning to the applicability of *Dorado* to defendant's extrajudicial statements, we have no difficulty in concluding that they were taken under circumstances proscribed by the rule announced in *Dorado* following the decision of the United States Supreme Court in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. Since defendant was under arrest at the time he made each of his statements, under the holding of *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], it is apparent that the *Dorado* requirements of custody and focus were fulfilled.     In addition, as to the requirement that an accused be advised of his right to counsel or to remain silent, *Stewart* holds that we cannot presume, in the face of a silent record, that the police informed a defendant of these rights.     The record in the instant case being silent as to this element of the *Dorado* rule, the *Stewart* holding is thus applicable, and we turn to the *Dorado* requirement that the authorities have carried out a process of interrogations that lent itself to eliciting incriminating statements. While *Stewart* holds that the test to apply in determining this issue is an "objective" one requiring an analysis of "the total situation" including such factors as "the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances" (p. 579), in the instant case

the record contains little evidence as to the manner in which the subject statements were elicited.[1] In *People* v. *North,* 233 Cal.App.2d 884 [44 Cal.Rptr. 123], the reviewing court was confronted with a similar record. Alluding to the statement in *Stewart* that in " 'most cases' " an interrogation by the police lends itself to eliciting incriminating statements, the appellate court there held that "in the absence of any contrary showing thereon in the record" it could not presume that the case was "one of the 'rare' or 'unusual' cases in which it did not so lend itself." (P. 888; see also *People* v. *Green,* 236 Cal.App.2d 1, 14-15 [45 Cal.Rptr. 744].) Accordingly, in the light of the principle announced in *North* we must assume that defendant's extrajudicial statements were obtained pursuant to a process of interrogations that lent itself to eliciting incriminating statements.

In addition, in applying the *Dorado* rule in the instant action, we are faced with the problem of determining whether a statement which is made to a parole officer is within the purview of the exclusionary rule announced therein. ■ We are of the opinion that a parole officer is a person of authority, as this term is used in *Dorado*. ■ As is stated in *People* v. *Denne,* 141 Cal.App.2d 499, 508 [297 P.2d 451], "Rules and regulations for the conduct of paroled convicts are rules and regulations for the control of prisoners. [Citation.] The enforcement of these rules while the parolee is at large is the responsibility of the parole officer, a functionary of the administrative agency charged with supervising the conduct and charting the social progress of the parolee." In *People* v. *Quinn,* 61 Cal.2d 551 [39 Cal.Rptr. 393, 393 P.2d 705], our Supreme Court recently held that involuntary admissions made by a defendant to a probation officer cannot be introduced into evidence. ■ Drawing an analogy from the *Quinn* case, we conclude that statements which are improperly obtained from a defendant by his parole officer, either because they were involuntarily made or because they were obtained in violation of a defendant's right to be informed of his right to counsel or to remain silent, cannot properly be introduced into evidence.

---

[1]Specifically, as to the manner in which each of defendant's statements was taken, the record is silent except as to the statement made to Page. With respect to this statement defendant testified that he was ill and groggy when he made the statement; that he didn't remember what happened while the statement was being taken; and that while he recalled that he had been asked some questions, he couldn't say whether he made the statements "on my own" or whether Page "made the suggestions. . . ."

The People contend that *Dorado* is inapplicable because the statements used were exculpatory and their use constituted harmless error. An exculpatory statement, however, may become incriminatory when it is used for purposes of impeachment. ■ In the present case the portions of the subject statements used by the prosecution were used solely for the purpose of impeachment to disprove defendant's testimony at the trial and to establish his incredibility. As such they were incriminating statements or admissions. (*People* v. *Green, supra,* pp. 16-17; *People* v. *Burns,* 232 Cal.App.2d 587, 589 [43 Cal.Rptr. 84]; *People* v. *Reid,* 233 Cal.App.2d 163, 178-179 [43 Cal.Rptr. 379].) In *Green,* we held that the fact that a statement is used by the prosecution to impeach a defendant rather than as part of its case-in-chief does not prevent the application of *Dorado* or *Escobedo*. In reaching this conclusion we noted the unequivocal language of *Escobedo* that *"no statement* elicited by the police during the interrogation *may be used against him* [the defendant] at a criminal trial."* (Italics added; p. 491; see *People* v. *Underwood,* 61 Cal.2d 113, 120-121 [37 Cal.Rptr. 313, 389 P.2d 937].) ■ Accordingly, we conclude that in the instant case all three of defendant's extrajudicial statements were obtained in violation of the *Dorado* rule and were erroneously admitted into evidence at the trial. However, since none of the statements was a confession the admission of which is deemed prejudicial per se under *Dorado,* we must consider whether the erroneous admission into evidence of these statements resulted in prejudicial error. (*People* v. *Hillery,* 62 Cal.2d 692, 710-712 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Schader,* 62 Cal.2d 716, 728 [44 Cal.Rptr. 193, 401 P.2d 665]; Cal. Const., art. VI, § 4½.) We are of the opinion that no such prejudice occurred.

Although the evidence connecting defendant with the instant charge was essentially circumstantial, it was, nonetheless, strong. The record discloses that defendant was on duty at the Inn as night clerk on the morning of the theft; he had access to the change box and, as was later discovered, to the drop safe; although the contents of all four of the desk drawers belonging to each clerk were gone, defendant's drawer had not been forced; during the morning of the theft, defendant, along with his automobile, disappeared; defendant's automobile was later found abandoned in Bakersfield; empty envelopes which had contained cash and were stamped "The Oakland Inn" were found under the front seat of defendant's

automobile; defendant made no effort to contact anyone at the Inn about the theft and instead fled to Southern California and eventually to Chicago. Moreover, although at the trial and in his various extrajudicial statements defendant maintained that he had been robbed and had fled in panic, his alibi was discredited by the corroborated testimony of Holloway, whom defendant named as one of the "robbers," that the former had been home during the entire evening of the theft. Finally, defendant's credibility was further weakened by the fact that on his employment application with the Inn, he had omitted any reference to the three previous felony convictions which he had suffered, and he had also made false statements concerning his previous employment and his schooling. Finally, the fact, as brought out by the prosecution in cross-examining defendant, that he had in fact suffered prior felony convictions would entitle the jury to disbelieve his version of the alleged robbery. (Code Civ. Proc., § 2051; *People* v. *Grischott,* 107 Cal.App.2d 631, 634 [237 P.2d 712]; *People* v. *Klimek,* 172 Cal.App.2d 36, 44 [341 P.2d 722]; *People* v. *Bagley,* 208 Cal.App.2d 482, 487-488 [25 Cal.Rptr. 340].) Accordingly, we conclude that the evidence connecting defendant with the instant theft charge was so strong that a result more favorable to him would not have been reached had the prosecution not been allowed to impeach defendant with his extrajudicial statements. Since there is no reasonable probability that the jury would have reached a result more favorable to defendant if these statements had been excluded, the judgment must be affirmed. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied September 30, 1965, and appellant's petition for a hearing by the Supreme Court was denied November 16, 1965.