[Crim. No. 4893.   First Dist., Div. Two.   Nov. 17, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID BREEN, Defendant and Appellant.

Robert L. Condon, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.

TAYLOR, J.—On this appeal from a judgment of conviction entered on a jury verdict finding defendant, David Breen, guilty of second degree murder (Pen. Code, § 189) and accessory to murder (Pen. Code, § 32), the only question is whether four statements made by defendant after his arrest were admitted in violation of the rule announced in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

Since no contentions are raised concerning the sufficiency of the evidence, a brief summary of the facts will suffice. About 12:30 a.m. on February 9, 1964, the decedent, Charles Ross, a Richmond police officer, was on duty near the corner of Ninth and Bissell. At this time, defendant, then 19 years old, and his contemporary, Frank Gomez, were walking in that vicinity on their way to defendant's home, after drinking at several parties. Both of them appeared to be drunk to the witnesses who saw them stop in front of 916 Bissell Avenue, around the corner from defendant's apartment at 160 Ninth Street.

Officer Ross' chief, Sergeant Gustafson, drove by and noticed Ross' patrol car parked on the wrong side of the street opposite 916 Bissell and saw Ross talking to two boys, one of whom he recognized as defendant. The sergeant drove slowly, attracted Officer Ross' attention and made the signal customarily used to inquire if a fellow officer required assistance. As Ross did not respond to the sergeant's signal, the sergeant drove on. A few minutes later, Officer Ross was mortally wounded by a bullet from his own gun and died.

Several witnesses heard four shots, with a pause between the first volley and the last three, as well as two voices talking before the shooting. One of the witnesses, Mrs. Dunn, who lived a few houses from defendant, heard footsteps running by her front window immediately after the shooting and saw

two boys proceeding to 160 Ninth Street. Mrs. Dunn noted that the lights were on in the lower apartment at that address and subsequently were turned out. About an hour later, she heard more noises coming from the rear of 160 Ninth Street.

When Sergeant Gustafson returned to the police station, he obtained the report of a prior incident involving defendant and confirmed his identification. He also contacted defendant's mother who gave him defendant's address. The shooting of Officer Ross was discovered immediately. Between 6:10 and 6:30 a.m., Sergeant Gustafson and several other officers knocked on defendant's door a number of times. When no one answered, Sergeant Gustafson left, leaving two officers at the apartment. About 9 a.m., the two officers were relieved by several others who entered and arrested defendant, his wife Carmen, Frank Gomez, and Gomez's half-brother, Edmund Bally. Officer Ross' gun with four expended cartridges was found in the back yard of 914 Bissell Avenue. Defendant's blood-stained clothing was found in the house. There was much physical evidence of a violent struggle at the scene of the shooting.

Immediately after his arrest, about 10:30 a.m., defendant was taken to the conference room of the police station and gave his first statement to an Officer Browne who had arrested him. When Browne asked defendant why he had not answered the door about 6 a.m., he replied that he was a very sound sleeper and had been drunk the night before. He had not heard any knocking and woke up only as the officers entered his home to arrest him. On the evening of February 9, he and his wife had attended several wedding receptions and consumed considerable amounts of alcohol. When his wife, who was pregnant, became ill, he brought her home about 11:30 p.m. He remained at home and went to sleep after eating some food and vomiting. When asked if anyone else had come to his apartment that night, defendant first replied no one, but later indicated that Frank and Edmund came by about 1 a.m. and wanted to spend the night. After getting permission from his wife, he told them they could spend the night and returned to bed.

About 12:03 a.m., on February 10, defendant's second statement, made in response to the questions of Captain Lowell and Lieutenant Billingsly, was tape recorded. This tape was played to the jury at the trial but no transcript offered into evidence. Subsequently, the tape was transcribed and incorporated into the record on appeal. In substance, the second

statement was simply a more detailed version of the first. Defendant also related that when Frank and Edmund arrived, Frank was holding a gun, which Edmund subsequently took outside to dispose of at defendant's suggestion. Frank and Edmund informed defendant that Frank had shot a police officer four times after a scuffle. All three of them heard the officers knocking on the door about 6 a.m. but did not answer as by this time, they had heard a radio broadcast about the fatal shooting of Ross. Before the police finally entered the house, Frank and Edmund got in the closet and when the entering officers asked if anyone else was present, defendant replied that no one was there. Defendant was frightened because he and Frank were on parole.

Defendant's third statement was recorded about 1 a.m. on February 11, 1964, in the presence of his wife. Defendant indicated that this statement conflicted with his earlier ones, but was the truthful one. In the third statement, defendant admitted that his wife had left the wedding reception about 11:30 p.m. with Edmund, while he and Frank came home about 12:30 a.m. They were stopped by Officer Ross who asked defendant if he was drunk and noted that he was too young to be intoxicated. Ross asked defendant for identification. When defendant could not find his wallet, Ross got angry, told Frank to go home, grabbed defendant's shirt and held defendant against the police car with his night stick. During the scuffle between defendant and Ross, Frank told Ross to leave defendant alone, and was repeatedly told by Ross to go home. Defendant heard a loud noise and thought Ross had shot Frank. After several other loud noises, defendant realized that Ross was lying on his foot and had been shot by Frank. He and Frank ran, taking the gun with them. Later, the gun was thrown out the window and defendant changed his bloody clothes. Defendant repeated his story about hiding Frank and Edmund in the closet.

On February 12, 1964, defendant was interviewed by his youth authority parole agent and gave his fourth statement relating the events of February 9-10, in substantially the same manner as in his third statement.

At the trial, defendant admitted his involvement with Officer Ross and repeated substantially the same story he had given in his third and fourth extrajudicial statements. Also, his wife testified that he had told her the same version of the incident when he arrived at the house in blood-stained clothing. There was also testimony of two previous instances of

defendant's disposition to resist arrest and his displayed hatred for police officers.

The People contend that the *Dorado* rule is not applicable to defendant's first and fourth statements. It is argued that the defendant's first statement made to Officer Browne was not objectionable because it was obtained in the informal atmosphere of the conference room and did not result from a process of interrogation, under the test of *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]. Our review of the record indicates that the juvenile defendant and his companions were under arrest at the time. All three were intermittently interviewed with an apparent attempt to play one off against the other. The accusatory stage had thus been reached, and the required process of interrogation had definitely begun. The questioning was specific in nature and lent itself to eliciting incriminating admissions. Defendant's statement amounted to more than a mere ''narrative response'' to an invitational inquiry as to ''what happened'' as in *People* v. *Cotter,* 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862].

We also discount the People's argument that defendant's fourth statement was not objectionable because given to a California Youth Authority parole officer for purposes other than defendant's prosecution. This court held in *People* v. *Barry,* 237 Cal.App.2d 154, 160 [46 Cal.Rptr. 727], that the *Dorado* rule applies to statements made to an adult parole officer and our Supreme Court recently rejected the same argument made by respondent here in declaring inadmissible a statement elicited from a defendant in absence of his counsel by a court-appointed psychiatrist (*In re Spencer,* 63 Cal.2d 400, 411 [46 Cal.Rptr. 753, 406 P.2d 33]).

The People, with commendable objectivity, concede that defendant neither waived nor was he advised of his right to counsel or to remain silent before the taking of any of his extrajudicial statements, as required by *Dorado,* and that the accessory conviction must be reversed since defendant's statements are tantamount to confessions of that crime (*People* v. *Hardin,* 207 Cal.App.2d 336 [24 Cal.Rptr. 563]) and as such are prejudicial per se (*People* v. *Lilliock,* 62 Cal.2d 618 [43 Cal.Rptr. 699, 401 P.2d 4]).

Defendant argues that since the statements constituted confessions, the second degree murder charge must likewise be reversed. We cannot agree. As to the murder charge, none of the statements contained the essential elements of the crime. The first two merely placed defendant with Frank and Ed-

mund after the crime and indicated his assistance in thwarting the police investigation. In his third and fourth statements, defendant admitted his involvement with Officer Ross but placed full blame for the shooting on Frank and stressed Officer Ross' aggressive conduct as well as his own intoxicated condition. While the statements contained some damaging admissions, they were all exculpatory in nature and did not amount to confessions of murder. Thus, we must review the total evidence and determine whether defendant was prejudiced by the improperly admitted statements (*People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Robinson,* 62 Cal.2d 889, 897 [44 Cal.Rptr. 762, 402 P.2d 834]).

The testimony of defendant's guilt at the trial, apart from his extrajudicial statements, was overwhelming. He was placed at the scene with Officer Ross and Frank by Sergeant Gustafson. Physical evidence showed a violent struggle. Defendant's blood-stained clothing, which his wife testified he was wearing when he came to the apartment with Frank, was admitted into evidence. Defendant's wife's testimony related his admission to her of his struggle with Officer Ross and the shooting that ensued and corroborated in every material respect defendant's third and fourth statements. Defendant's disposition to resist arrest and his dislike of police officers was clearly demonstrated. He took the stand himself and reiterated the story he had related in his third and fourth statements, admitted his struggle with Officer Ross, and the shooting by Frank. It is clear that neither defendant's testimony nor that of his wife was impelled by the erroneous admissions of the extrajudicial statements. The compulsion to testify was the incriminating testimony of the prosecution's witnesses (*People* v. *Nye,* 63 Cal.2d 166, 175 [45 Cal.Rptr. 328, 403 P.2d 736]). Without defendant's statements or testimony, the prosecution's case pointed to first degree murder since Frank did not testify. It has been held that admissions made in the course of an attempted exculpatory statement are not prejudicially received when the defendant at the trial testifies substantially to the same admissions (*People* v. *Mathis,* 63 Cal.2d 416, 433 [46 Cal.Rptr. 785, 406 P.2d 65]).

We are satisfied after an examination of the entire record that defendant had a fair trial as to the murder charge and that it is not reasonably possible that a result more favorable to defendant would have been reached in the absence of the admission of his extrajudicial statements into evidence (Cal.

Const., art. VI, § 4½; *Fahy* v. *Connecticut,* 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Jacobson,* 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555]).

The judgment is reversed as to the accessory charge and affirmed as to the second degree murder charge.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied December 17, 1965, and appellant's petition for a hearing by the Supreme Court was denied January 12, 1966.