# HARRIS v. NEW YORK

No. 206.   Argued December 17, 1970—Decided February 24, 1971

BURGER, C. J., delivered the opinion of the Court, in which HARLAN, STEWART, WHITE, and BLACKMUN, JJ., joined. BLACK, J., dissented. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post,* p. 226.

*Joel Martin Aurnou* argued the cause and filed a brief for petitioner.

*James J. Duggan* argued the cause for respondent. With him on the brief was *Carl A. Vergari.*

*Sybil H. Landau* argued the cause for the District Attorney of New York County as *amicus curiae* urging affirmance.   With her on the brief were *Frank S. Hogan, pro se,* and *Michael R. Juviler.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted the writ in this case to consider petitioner's claim that a statement made by him to police under circumstances rendering it inadmissible to establish the prosecution's case in chief under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), may not be used to impeach his credibility.

The State of New York charged petitioner in a two-count indictment with twice selling heroin to an under-

cover police officer. At a subsequent jury trial the officer was the State's chief witness, and he testified as to details of the two sales. A second officer verified collateral details of the sales, and a third offered testimony about the chemical analysis of the heroin.

Petitioner took the stand in his own defense. He admitted knowing the undercover police officer but denied a sale on January 4, 1966. He admitted making a sale of contents of a glassine bag to the officer on January 6 but claimed it was baking powder and part of a scheme to defraud the purchaser.

On cross-examination petitioner was asked seriatim whether he had made specified statements to the police immediately following his arrest on January 7—statements that partially contradicted petitioner's direct testimony at trial. In response to the cross-examination, petitioner testified that he could not remember virtually any of the questions or answers recited by the prosecutor. At the request of petitioner's counsel the written statement from which the prosecutor had read questions and answers in his impeaching process was placed in the record for possible use on appeal; the statement was not shown to the jury.

The trial judge instructed the jury that the statements attributed to petitioner by the prosecution could be considered only in passing on petitioner's credibility and not as evidence of guilt. In closing summations both counsel argued the substance of the impeaching statements. The jury then found petitioner guilty on the second count of the indictment.[1] The New York Court of Appeals affirmed in a *per curiam* opinion, 25 N. Y. 2d 175, 250 N. E. 2d 349 (1969).

At trial the prosecution made no effort in its case in chief to use the statements allegedly made by petitioner,

---

[1] No agreement was reached as to the first count. That count was later dropped by the State.

conceding that they were inadmissible under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). The transcript of the interrogation used in the impeachment, but not given to the jury, shows that no warning of a right to appointed counsel was given before questions were put to petitioner when he was taken into custody. Petitioner makes no claim that the statements made to the police were coerced or involuntary.

Some comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. *Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.

In *Walder* v. *United States*, 347 U. S. 62 (1954), the Court permitted physical evidence, inadmissible in the case in chief, to be used for impeachment purposes.

> "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

> "[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." 347 U. S., at 65.

It is true that Walder was impeached as to collateral matters included in his direct examination, whereas petitioner here was impeached as to testimony bearing more directly on the crimes charged. We are not persuaded that there is a difference in principle that warrants a result different from that reached by the Court in *Walder*. Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.

Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See *United States* v. *Knox,* 396 U. S. 77 (1969); cf. *Dennis* v. *United States,* 384 U. S. 855 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.[2] Had

---

[2] If, for example, an accused confessed fully to a homicide and led the police to the body of the victim under circumstances making his confession inadmissible, the petitioner would have us allow that accused to take the stand and blandly deny every fact disclosed to the police or discovered as a "fruit" of his confession, free from confrontation with his prior statements and acts. The voluntariness of the confession would, on this thesis, be totally irrelevant. We reject such an extravagant extension of the Constitution. Compare *Killough* v. *United States,* 114 U. S. App. D. C. 305, 315 F. 2d 241 (1962).

inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements.

*Affirmed.*

MR. JUSTICE BLACK dissents.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

It is conceded that the question-and-answer statement used to impeach petitioner's direct testimony was, under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), constitutionally inadmissible as part of the State's direct case against petitioner. I think that the Constitution also denied the State the use of the statement on cross-examination to impeach the credibility of petitioner's testimony given in his own defense. The decision in *Walder* v. *United States,* 347 U. S. 62 (1954), is not, as the Court today holds, dispositive to the contrary. Rather, that case supports my conclusion.

The State's case against Harris depended upon the jury's belief of the testimony of the undercover agent that petitioner "sold" the officer heroin on January 4 and again on January 6. Petitioner took the stand and flatly denied having sold anything to the officer on January 4. He countered the officer's testimony as to the January 6 sale with testimony that he had sold the officer two glassine bags containing what appeared to be heroin, but that actually the bags contained only baking powder intended to deceive the officer in order to obtain $12.

The statement contradicted petitioner's direct testimony as to the events of both days. The statement's version of the events on January 4 was that the officer had used petitioner as a middleman to buy some heroin from a third person with money furnished by the officer. The version of the events on January 6 was that petitioner had again acted for the officer in buying two bags of heroin from a third person for which petitioner received $12 and a part of the heroin. Thus, it is clear that the statement was used to impeach petitioner's direct testimony not on collateral matters but on matters directly related to the crimes for which he was on trial.[1]

*Walder* v. *United States* was not a case where tainted evidence was used to impeach an accused's direct testimony on matters directly related to the case against him. In *Walder* the evidence was used to impeach the accused's testimony on matters *collateral* to the crime charged. Walder had been indicted in 1950 for purchasing and possessing heroin. When his motion to suppress use of the narcotics as illegally seized was granted, the Government dismissed the prosecution. Two years later Walder was indicted for another narcotics violation completely unrelated to the 1950 one. Testifying in his own defense, he said on direct examination that he had never in his life possessed narcotics. On cross-examination he denied that law enforcement officers had seized narcotics from his home two years earlier. The Government was then permitted to introduce the testimony of one of the officers involved in the 1950 seizure, that when he had raided Walder's home at that time he had seized narcotics there.

---

[1] The trial transcript shows that petitioner testified that he remembered making a statement on January 7; that he remembered a few of the questions and answers; but that he did not "remember giving too many answers." When asked about his bad memory, petitioner, who had testified that he was a heroin addict, stated that "my joints was down and I needed drugs."

The Court held that on facts where "the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics," 347 U. S., at 65, the exclusionary rule of *Weeks* v. *United States,* 232 U. S. 383 (1914), would not extend to bar the Government from rebutting this testimony with evidence, although tainted, that petitioner had in fact possessed narcotics two years before. The Court was careful, however, to distinguish the situation of an accused whose testimony, as in the instant case, was a "denial of complicity in the crimes of which he was charged," that is, where illegally obtained evidence was used to impeach the accused's direct testimony on matters directly related to the case against him. As to that situation, the Court said:

> "Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." 347 U. S., at 65.

From this recital of facts it is clear that the evidence used for impeachment in *Walder* was related to the earlier 1950 prosecution and had no direct bearing on "the elements of the case" being tried in 1952. The evidence tended solely to impeach the credibility of the defendant's direct testimony that he had never in his life possessed heroin. But that evidence was completely unrelated to the indictment on trial and did not in any way interfere with his freedom to deny all elements of that case against him. In contrast, here, the evidence used for impeachment, a statement concerning the details of the very sales alleged in the indictment, was directly related to the case against petitioner.

While *Walder* did not identify the constitutional specifics that guarantee "a defendant the fullest opportunity to meet the accusation against him . . . [and permit him to] be free to deny all the elements of the case against him," in my view *Miranda* v. *Arizona*, 384 U. S. 436 (1966), identified the Fifth Amendment's privilege against self-incrimination as one of those specifics.[2]

---

[2] Three of the five judges of the Appellate Division in this case agreed that the State's use of petitioner's illegally obtained statement was an error of constitutional dimension. *People* v. *Harris*, 31 App. Div. 2d 828, 298 N. Y. S. 2d 245 (1969). However, one of the three held that the error did not play a meaningful role in the case and was therefore harmless under our decision in *Chapman* v. *California*, 386 U. S. 18 (1967). He therefore joined in affirming the conviction with the two judges who were of the view that there was no constitutional question involved. 31 App. Div. 2d, at 830, 298 N. Y. S. 2d, at 249. I disagree that the error was harmless and subscribe to the reasoning of the dissenting judges, *id.*, at 831–832, 298 N. Y. S. 2d at 250:

"Under the circumstances outlined above, I cannot agree that this error of constitutional dimension was 'harmless beyond a reasonable doubt' (*Chapman* v. *California*, 386 U. S. 18, 24). An error is not harmless if 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction' (*Fahy* v. *Connecticut*, 375 U. S. 85, 86–87). The burden of showing that a constitutional error is harmless rests with the People who, in this case, have not even attempted to assume that demonstration (*Chapman* v. *California*, *supra*). Surely it cannot be said with any certainty that the improper use of defendant's statement did not tip the scales against him, especially when his conviction rests on the testimony of the same undercover agent whose testimony was apparently less than convincing on the January 4 charge (cf. *Anderson* v. *Nelson*, 390 U. S. 523, 525). On the contrary, it is difficult to see how defendant could not have been damaged severely by use of the inconsistent statement in a case which, in the final analysis, pitted his word against the officer's. The judgment should be reversed and a new trial granted."

The Court of Appeals affirmed *per curiam* on the authority of its earlier opinion in *People* v. *Kulis*, 18 N. Y. 2d 318, 221 N. E. 2d 541 (1966). Chief Judge Fuld and Judge Keating dissented in *Kulis* on the ground that *Miranda* precluded use of the statement for impeachment purposes, 18 N. Y. 2d, at 323, 221 N. E. 2d, at 542.

That privilege has been extended against the States. *Malloy* v. *Hogan,* 378 U. S. 1 (1964). It is fulfilled only when an accused is guaranteed the right "to remain silent unless he chooses to speak in the *unfettered* exercise of his own will," *id.,* at 8 (emphasis added). The choice of whether to testify in one's own defense must therefore be "unfettered," since that choice is an exercise of the constitutional privilege, *Griffin* v. *California,* 380 U. S. 609 (1965). *Griffin* held that comment by the prosecution upon the accused's failure to take the stand or a court instruction that such silence is evidence of guilt is impermissible because it "fetters" that choice—"[i]t cuts down on the privilege by making its assertion costly." *Id.,* at 614. For precisely the same reason the constitutional guarantee forbids the prosecution to use a tainted statement to impeach the accused who takes the stand: The prosecution's use of the tainted statement "cuts down on the privilege by making its assertion costly." *Ibid.* Thus, the accused is denied an "unfettered" choice when the decision whether to take the stand is burdened by the risk that an illegally obtained prior statement may be introduced to impeach his direct testimony denying complicity in the crime charged against him.[3] We settled this proposition in *Miranda* where we said:

> "The privilege against self-incrimination protects the individual from being compelled to incriminate himself in *any* manner . . . . [S]tatements merely intended to be exculpatory by the defendant are often *used to impeach his testimony at trial . . . . These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for*

---

[3] It is therefore unnecessary for me to consider petitioner's argument that *Miranda* has overruled the narrow exception of *Walder* admitting impeaching evidence on collateral matters.

*any other statement."* 384 U. S., at 476–477 (emphasis added).

This language completely disposes of any distinction between statements used on direct as opposed to cross-examination.[4] "An incriminating statement is as incriminating when used to impeach credibility as it is when used as direct proof of guilt and no constitutional distinction can legitimately be drawn." *People* v. *Kulis,* 18 N. Y. 2d 318, 324, 221 N. E. 2d 541, 543 (1966) (dissenting opinion).

The objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system. The "essential mainstay" of that system, *Miranda* v. *Arizona,* 384 U. S., at 460, is the privilege against self-incrimination, which for

---

[4] Six federal courts of appeals and appellate courts of 14 States have reached the same result. *United States* v. *Fox,* 403 F. 2d 97 (CA2 1968); *United States* v. *Pinto,* 394 F. 2d 470 (CA3 1968); *Breedlove* v. *Beto,* 404 F. 2d 1019 (CA5 1968); *Groshart* v. *United States,* 392 F. 2d 172 (CA9 1968); *Blair* v. *United States,* 130 U. S. App. D. C. 322, 401 F. 2d 387 (1968); *Wheeler* v. *United States,* 382 F. 2d 998 (CA10 1967); *People* v. *Barry,* 237 Cal. App. 2d 154, 46 Cal. Rptr. 727 (1965), cert. denied, 386 U. S. 1024 (1967); *Velarde* v. *People,* 171 Colo. 261, 466 P. 2d 919 (1970); *State* v. *Galasso,* 217 So. 2d 326 (Fla. 1968); *People* v. *Luna,* 37 Ill. 2d 299, 226 N. E. 2d 586 (1967); *Franklin* v. *State,* 6 Md. App. 572, 252 A. 2d 487 (1969); *People* v. *Wilson,* 20 Mich. App. 410, 174 N. W. 2d 79 (1969); *State* v. *Turnbow,* 67 N. M. 241, 354 P. 2d 533 (1960); *State* v. *Catrett,* 276 N. C. 86, 171 S. E. 2d 398 (1970); *State* v. *Brewton,* 247 Ore. 241, 422 P. 2d 581, cert. denied, 387 U. S. 943 (1967); *Commonwealth* v. *Padgett,* 428 Pa. 229, 237 A. 2d 209 (1968); *Spann* v. *State,* 448 S. W. 2d 128 (Tex. Cr. App. 1969); *Cardwell* v. *Commonwealth,* 209 Va. 412, 164 S. E. 2d 699 (1968); *Gaertner* v. *State,* 35 Wis. 2d 159, 150 N. W. 2d 370 (1967); see also *Kelly* v. *King,* 196 So. 2d 525 (Miss. 1967). Only three state appellate courts have agreed with New York. *State* v. *Kimbrough,* 109 N. J. Super. 57, 262 A. 2d 232 (1970); *State* v. *Butler,* 19 Ohio St. 2d 55, 249 N. E. 2d 818 (1969); *State* v. *Grant,* 77 Wash. 2d 47, 459 P. 2d 639 (1969).

that reason has occupied a central place in our juris-
prudence since before the Nation's birth.   Moreover, "we
may view the historical development of the privilege as
one which groped for the proper scope of governmental
power over the citizen. . . .   All these policies point to
one overriding thought: the constitutional foundation
underlying the privilege is the respect a government . . .
must accord to the dignity and integrity of its citizens."
*Ibid.*   These values are plainly jeopardized if an excep-
tion against admission of tainted statements is made for
those used for impeachment purposes.   Moreover, it is
monstrous that courts should aid or abet the law-breaking
police officer.   It is abiding truth that "[n]othing can
destroy a government more quickly than its failure to
observe its own laws, or worse, its disregard of the charter
of its own existence."   *Mapp* v. *Ohio,* 367 U. S. 643, 659
(1961).   Thus, even to the extent that *Miranda* was
aimed at deterring police practices in disregard of the
Constitution, I fear that today's holding will seriously
undermine the achievement of that objective.   The Court
today tells the police that they may freely interrogate an
accused incommunicado and without counsel and know
that although any statement they obtain in violation of
*Miranda* cannot be used on the State's direct case, it may
be introduced if the defendant has the temerity to testify
in his own defense.   This goes far toward undoing much
of the progress made in conforming police methods to
the Constitution.   I dissent.