PEOPLE v BOBO

1. CRIMINAL LAW—DEFENDANT TESTIFYING—IMPEACHMENT—PRIOR IN-
CONSISTENT STATEMENTS.

The prosecution has a right to impeach defendant's credibility by
showing his prior inconsistent statements when the defendant
takes the stand and makes affirmative allegations as to his
innocence.

2. CRIMINAL LAW—DEFENDANT TESTIFYING—IMPEACHMENT—REFUSAL
TO MAKE STATEMENT.

The prosecution may impeach the defendant's credibility when
defendant's prior refusal to make a statement is inconsistent
with his affirmative allegations at the time of trial.

3. CRIMINAL LAW—DEFENDANT TESTIFYING—IMPEACHMENT—REFUSAL
TO MAKE STATEMENT—ADMISSIBILITY.

A defendant's refusal to make a statement at the time of arrest
or thereafter is admissible for the sole purpose of impeaching
the defendant's credibility when the defendant has taken the
stand and made affirmative allegations.

4. CRIMINAL LAW—CLOSING ARGUMENT—REFUSAL TO MAKE STATE-
MENT.

The prosecution's right to summarize the evidence and to make
fair comments on that evidence in his closing argument in-
cludes the right to comment on a defendant's failure to make a
statement at the time of arrest or thereafter when failure to
make a statement has been used to impeach defendant's credi-
bility.

Appeal from Recorder's Court of Detroit, An-
drew C. Wood, J. Submitted Division 1 April 11,
1972, at Detroit. (Docket No. 9860.) Decided June
26, 1972. Leave to appeal granted, 388 Mich 798.

REFERENCES FOR POINTS IN HEADNOTES
[1] 58 Am Jur, Witnesses § 688.
[2–4] 29 Am Jur 2d, Evidence § 189.

Ned L. Bobo was convicted of entering without breaking with intent to commit larceny. Defendant appeals. Conviction affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas P. Smith,* Assistant Prosecuting Attorney, for the people.

*Gerald M. Lorence,* for defendant on appeal.

Before: FITZGERALD, P. J., and MCGREGOR and O'HARA,* JJ.

MCGREGOR, J. Defendant was jointly charged, with four others, with the offense of breaking and entering with intent to commit a felony or larceny,[1] and after a joint trial, was convicted on a jury's verdict of entering (without breaking) with intent to commit larceny.[2]

Defendant and a companion were stopped by an off-duty police officer as they were observed coming from the direction of a vacant lot. The officer stopped them on suspicion in connection with a street robbery he had witnessed nearby. He was joined by two uniformed police officers and, later, by a plainclothes detective. The detective and his partner had been informed by a passerby of the break-in at a furniture store; arriving at the store they saw and arrested a man on the street in front of the broken store windows, holding a television set later identified as belonging to the store. Prior

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] MCLA 750.110; MSA 28.305.

[2] MCLA 750.111; MSA 28.306.

to the arrest of this man, one of the detectives saw two persons running from the building. At trial, the detective testified:

"They were, when I first saw them, they were running from where Mr. Griffin was, running southeast along the building to a vacant lot adjacent to the building and then east along the building from where I lost tract *[sic]* them and then picked them up. Oh, I should say, I saw them talking to a white man later identified as a police officer maybe 50 to 100 feet in the rear of the building on another street."

The detective saw the men running along the side of the building, carrying large articles in their hands. Two television sets, later identified as coming from the store, were subsequently found in the vacant lot adjacent to the building, along the same general path where this defendant ran. However, instead of following the men immediately, the detective's attention was diverted by activity within the store. He saw defendant's brother, Brayford Bobo, attempting to break the chain securing a television set inside the building and arrested him. The detective returned to the building and found a man rifling through the store office and arrested him. The detective then went in pursuit of the two running men, and finding them with the three police officers, placed them personally under arrest, after asking the officer where he met them and from which direction they had come. Approximately five minutes elapsed from the time the detective first saw the two men running around the corner from the furniture store and arrested the men in the police officers' custody. While the detective had not been able to see their faces, he had observed their general physical characteristics and clothing, and was able

to designate this defendant as being similar to one of the people he had chased from the building.

At trial, the detective's testimony was corroborated in part by the police officers. The police officer testified to seeing the two men running from the direction of the furniture store at the time of the break-in, to the arrival of the police officers shortly thereafter, and to the men identifying themselves. One of the officers testified as to seeing two persons running through the vacant lot adjacent to the furniture store to the point at which they were stopped by the police officers, and identified this defendant as one of the men so apprehended, in court.

This defendant and the other three men testified at trial and admitted mutual acquaintance, but all denied that they had participated in the alleged break-in.

On appeal, the principal issue is whether it was error for the prosecutor to comment on defendant's failure to tell the police about two other persons he allegedly saw running from the break-in scene.

At trial, one of the men testified that he was with this defendant when they were stopped by the off-duty policeman, and that they were on their way to the home of the defendant's aunt, who lived nearby. When questioned as to whether he had seen anybody else on the street, this witness replied:

"We seen two guys run through the alley. They come from over by Tyme and went through the alley."

He said they went south toward Lysander Street and were "colored".

This defendant testified that he had left his father's house with his friend to go to his aunt's

house and was stopped by the police nearby. He testified further that he saw two men run past, moments before police stopped him. On cross-examination, the prosecutor asked this defendant whether he mentioned anything about the two running men to the police, to which defendant replied negatively, over his attorney's objection. Further questioning occurred along these lines, with defense counsel registering continuous objections and finally moving for a mistrial on constitutional grounds, which motion was denied.

In his final argument, the prosecutor stated:

"Oh, yes, one of the defendants yesterday said something about two other men. Two other men, as they were walking, mind you, from the other direction, from what had been previously testified to by three of the officers, they claim now they were coming from the other direction and two phantoms, two men who they claim ran past them five or six feet past them down the. alley. Yet within five or six feet Edison and Ned Bobo who claimed they saw these men said nothing to the police,"

to which statement defense counsel raised objection and moved for a mistrial:

"*Mr. M. Summers:* If the court please, just a minute. I have an objection here. If the court please, at this point I move for a mistrial on behalf of Ned Ladd Bobo on the ground that the prosecutor has violated that defendant's privilege against incrimination. The defendant Ned Ladd Bobo at the time of his interrogation by Detective Berryman with the gun pointed at him being questioned about a robbery had no duty whatsoever to speak to that detective about anything. And his failure to speak to that cannot be held against him. And I submit that I am entitled to a mistrial,"

which motion the trial court denied, and the prosecution continued:

*"The Court:* I will deny the motion. And so go ahead, Mr. Stephens.

*"Mr. Stephens:* He said nothing. Pointed nowhere. Did nothing. And further, they don't even recall what they were wearing. And yet they want you, and yet, and yet they come in here and they want you to believe that instead of running away from Tyme Furniture toward Caroline across Wabash away from the scene, they were suddenly going in the opposite direction approaching Tyme. And I couldn't even get that Ned Bobo to indicate that he could see past Wabash as he was allegedly walking. 'I din't see that far.' 'I wasn't looking that far.' He only looked up to Wabash. Why? Because he wasn't going that way. He wasn't going that way."

On appeal, defense counsel argues that the prosecuting attorney made impermissible comment on defendant's exercise of his constitutional rights against self-incrimination.

In *People v Graham,* 386 Mich 452, 456–458 (1971), the Court stated:

"The United States Supreme Court recently reaffirmed its position that otherwise inadmissible evidence may be used to impeach the testimony of a defendant. In *Harris v New York* (1971), 401 US 222 (91 S Ct 643, 28 L Ed 2d 1) the Court affirmed the conviction of the defendant and stated that an otherwise inadmissible statement of the defendant could be utilized for impeachment purposes. The Court specifically addressed itself to the question of whether *Miranda v Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974) forbade the use of such statements for impeachment:

" 'Some comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. *Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or

effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards. * * *

" 'The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements. 401 US 222, 224, 226.' "

The Court then stated:

"The testimony of Detective Baeyens is wholly inconsistent with the defendant's statements at trial. * * * The defendant refused to speak at all. This refusal to speak is inconsistent with his testimony at trial that he was constantly attempting to explain to the police what had occurred. Therefore such refusal to speak was properly admitted for the purpose of impeaching the defendant's credibility."

In the instant case, defendant took the stand and affirmatively stated that there were two other persons who ran from the scene of the crime and that he was merely an innocent bystander. Where the defendant takes the stand and makes affirmative allegations as to his innocence, the prosecution has a right to impeach defendant's credibility by showing his prior inconsistent statement. *Harris v New York, supra.* Furthermore, where defendant's prior refusal to make a statement is inconsistent with his affirmative allegations at the time of trial, the prosecution may question the defendant on this matter, so as to impeach his credibility. *People v Graham, supra.* The instant case is distinguishable from *People v Jablonski,* 38 Mich App 33 (1972), as in *Jablonski* the defendant did not take the stand and the prosecution elicited

the fact that defendant had refused to make a statement after being informed of his right to remain silent, not for the purpose of impeachment, but for the purpose of establishing in evidence that defendant had refused to make any statement. We reiterate, the prosecution may not use defendant's failure to make a statement as evidence of defendant's guilt. We hold that, where defendant takes the stand and makes affirmative allegations, defendant's refusal to make a statement at the time of arrest or thereafter is admissible for the sole purpose of impeaching defendant's credibility.

The Fifth Amendment right against self-incrimination does not include the right to commit perjury. There was no error committed by the prosecutor in cross-examining defendant on this matter. Similarly, the prosecutor's closing argument was not inflammatory and did not dwell excessively on this point. The prosecution (and the defense) have the right to summarize the evidence and to make fair comments on that evidence. No reversible error was committed as a result of the prosecutor's closing argument.

Defendant's other contentions are without merit.

Affirmed.

All concurred.