520 P.2d 492

**The STATE of Arizona, Appellee,**

v.

**Allen Lawrence MERONEK, Appellant.**

No. 2668.

Supreme Court of Arizona,
In Division.

April 2, 1974.

Gary K. Nelson, Atty. Gen., Phoenix, by Howard L. Fell, Asst. Atty. Gen., Tucson, for appellee.

Russo, Cox, Dickerson & Cartin, P. C., by William F. McDonald, Jr., Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a jury verdict and judgment of guilt to the crime of robbery, § 13–641 A.R.S., and a sentence of from five to six years in the Arizona State Prison.

We are asked to consider two questions on appeal:

1. Was the in-court identification of the defendant impermissibly tainted by pretrial identification procedures?

2. Was it error for the court to allow evidence of the pretrial identification, which had been previously excluded as unduly suggestive, to be admitted during the State's case in rebuttal?

The facts necessary for a determination of this matter on appeal are as follows. At about 1:20 a. m. on 22 November 1971, Brad Meronek and his uncle, Allen Meronek, drove into the Gulf Oil Station located near the corner of Prince Road and Flowing Wells Road in Tucson, Arizona, and purchased a dollar's worth of gasoline. The young men then drove their automobile behind the gas station. According to the testimony of the victim, Mr. Oprondek, age 65, who was the attendant in charge of the station that night, the defendant Allen Meronek then came from around the back of the station and asked for a dollar in change. When Oprondek opened the cashbox to get the change, he was struck on the head between the eyes, fell down, and the defendant then reached into the cashbox and took some bills and fled. Mr. Oprondek's glasses were shattered by the blow. At about the same time, a Pima County sheriff's automobile driven by a Deputy Sheriff Wing stopped at the intersection of Flowing Wells and Prince Roads. The deputy observed Mr. Oprondek on the ground and an individual running from the gas station. The deputy

proceeded across the intersection towards the gas station and observed the Meronek automobile emerge from behind the gas station. It stopped in the driveway at Flowing Wells Road. At the same time, Mr. Oprondek ran towards him stating that he had been robbed. The deputy turned on his lights, stopped the automobile, and radioed the Tucson Police Department for assistance. Minutes later two police officers from the Tucson Police Department, who commenced an investigation of the robbery, made a permissive search of the car which revealed some wadded bills underneath the passenger's seat. The two, Brad and Allen Meronek, both claimed that this money was won in a pool game earlier that evening. The two defendants were separated and placed in different police cars. The victim, Mr. Oprondek, identified the defendant Allen as the one who had robbed him and hit him on the head, although how positive this identification was is strongly contested.

Both the defendant and his nephew were tried on a charge of robbery. The nephew, Brad Meronek, was acquitted and the defendant Allen convicted.

### WAS THE IN-COURT IDEN-
### TIFICATION TAINTED?

A hearing was held out of the presence of the jury pursuant to State v. Dessureault, 104 Ariz. 380, 453 P.2d 951, Supp., 104 Ariz. 439, 454 P.2d 981 (1969), cert. den. 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed. 2d 257, to suppress evidence of the identification at the scene of the crime and also the in-court identification by the victim. The victim testified:

"Q  Now, you see them in court today; is that correct?

"A  Yes, I do.

"Q  You saw them outside of court when you were waiting; is that correct?

"A  Correct.

"Q  Okay. Is there any question in your mind that they were the two that came in for gas that night about one o'clock?

"A  No. It was really them two. It was still in my mind.

"Q  Is there any question in your mind that it was Allen Meronek that came up and asked you for change that night?

"A  To tell the truth, I don't know their names.

"Q  The taller one.

"A  The taller one, yes, he's the one that came in and asked. He's right there.

"Q  Do you remember that today?

"A  Today, positively.

"Q  Do you remember that from the——

"A  From the day it happened."

■ Defendant's attorney attempted to discredit the in-court identification. We find no evidence which would support the theory that the in-court identification had been tainted by impermissible conduct outside of the court. The victim further testified that he had seen the two boys in his station on more than one occasion prior to the robbery and was positive that the defendant was the person who actually robbed him. We find no error in the trial court's determination that the in-court identification was admissible. State v. Dessureault, supra.

### ADMISSION IN EVIDENCE OF
### PRETRIAL IDENTIFICATION

Defendant next contends that it was error to allow the State on rebuttal to introduce evidence of a previously excluded, as unduly suggestive, identification of the defendant.

The trial court, at the close of the Dessureault hearing, ruled:

"The pretrial identification which the Court understands is objected to here is the identification made by the victim at or near the scene shortly after the robbery took place.

"The Court understands that the position of the defendants is that it was unduly suggestive because it was a one on one situation. And, also, that it was the——

the victim was asked on more than one occasion to identify the defendant.

"The Court finds that because of the situation it was unduly suggestive and that the prosecution has failed to establish that it was not unduly suggestive by clear and convincing evidence."

The identification occurred during a period of some thirty minutes after the robbery and while the defendant was taken from the car in which he was riding, questioned and then separated and seated alone in one of the police cars.

Defendant testified on direct examination that after the victim came over:

"Q Was there a conversation then between Mr. Oprondek and Officer Wing?

"A Well, Officer Wing told us to step to the front of his car. And then Mr.—Mr. Oprondek said, 'No, that's not the people. It's not the ones who robbed me.'

And he told him to look around and they just wouldn't look around.

"Q Did he attempt to describe the person who had robbed him to the officers?

"A Well, he described the person. He said he was kind of tall with blond hair and he wanted to know if it was me and he told him again it wasn't me."

And on cross-examination:

"Q (By Mr. Brogna) Now, your testimony is that Mr. Oprondek continually stated it wasn't you.

"A He told the police officers several times it wasn't us, to please look around. And the police officers wouldn't look around.

"Q Did you hear Officer Wing testify as to what the person wore that he saw running across there?

"A Yes. A gray jacket.

"Q Did you hear him testify as to what you had on?

"A I had a gray jacket on that night. It wasn't ——"

Brad Meronek testified upon examination by defendant's attorney:

"Q (By Mr. McDonald) After there was a discussion between Officer Wing and the other officers, what happened then?

"A Oh, Mr. Omdecker (phonetic) came down by the cars again and looked at us again and then he was giving the officers a more or less general description, and they again from what I can remember he said that he—we were not the ones."

■ We believe that the defendant had sufficiently opened up the question of identification and that it was proper rebuttal to show that the victim did identify the defendant at that time, even though the court had previously ruled that the prosecution had failed to prove, by clear and convincing evidence, that the contested identification was not unduly suggestive.

This case is analogous to the United States Supreme Court case of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), wherein the court allowed the use of evidence inadmissible under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) admitted on rebuttal after the defendant took the stand and denied he had committed the crime for which he was charged. In Harris, supra, the United States Supreme Court stated:

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. (citations omitted) Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did not more than utilize the traditional truth-testing devices of the adversary process. [footnote omitted] Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements. Harris v. New York, supra, 401 U.S. at 225–226, 91 S.Ct. at 645–646, 28 L.Ed.2d at 4–5.

We believe that the instant case is stronger. Having successfully suppressed evidence that the victim had identified the defendant at the scene of the crime as the one who committed the robbery, defendant and his codefendant proceeded to tell the jury that the victim had positively stated defendant was not the one who committed the crime. The defendant, having opened the door, cannot now complain that evidence of the previously suppressed identification was then admitted during the State's rebuttal testimony to meet the statements of the two defendants.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, J., concur.