318 So.2d 753

Frank **WILSON**, Jr.

v.

**STATE.**

**6 Div. 605.**

Court of Criminal Appeals of Alabama.
Aug. 19, 1975.

Ralph C. Burroughs, Public Defender, Tuscaloosa, for appellant.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, for the State.

BOOKOUT, Judge.

First degree murder: sentence, life imprisonment.

The State's first witness, Dr. James W. Sherwood, testified that he examined John Clay Smith, Jr., in Druid City Hospital, Tuscaloosa, on November 24, 1972. He testified that Smith died of a wound from a shotgun fired at close range.

Mrs. Dorothy Bryant testified that on November 24, 1972, she was working under an arrangement with the Veteran's Administration to board certain veterans in her home, one of which was John Clay Smith. She stated that her half-brother Frank Wilson, Jr., came to her home on that date. He had an argument with Smith, whereupon, she ordered him from her home and he left. She then went into her child's room and no longer than thirty minutes later, she heard two shotgun blasts. At that time, she locked the bedroom door and heard the appellant then begin knocking on the door, saying: "open up, open up, I'm gonna to kill you, I'm gonna to kill you." She did not open the door and appellant left.

Smith called to her, and she found him lying wounded in the corner of his bedroom. She did not see a knife or other shiny object in the room near Smith. She looked out the window and saw her half-brother, the appellant, going down the driveway with a shotgun in his hands. She saw Thurman Crummie, Jr., drive up in an automobile.

Thurman Crummie, Jr. testified that on November 24, 1972, he drove to Dorothy

Bryant's home and saw Frank Wilson come out of the house with a shotgun in his hands. Wilson told him he was going to turn himself in, that he had just killed John Clay Smith. Wilson unloaded the shotgun, handed two shells to Crummie, put the gun in the car, and the witness drove him to the home of Jenny Kemp where James Wilson picked up the defendant and drove him off.

Johnny Wilson testified that he was the first cousin of the apppellant. On the date in question, the witness was in Dorothy Bryant's home. He saw the appellant leave in his automobile and return about a half hour later with a shotgun. The appellant walked through the den where the witness was sitting with an elderly veteran, went upstairs, and then two quick shots were heard. He saw the defendant then leave the house with a shotgun. The witness went to Smith's room and tried to help another veteran carry Smith to the car in order to take him to the hospital, but they were unable to do so.

Witness Jenny Kemp stated that she was a first cousin of Dorothy Bryant and of the appellant. She said Thurman Crummie brought the appellant to her home on the date in question. The appellant had a shotgun in hand and asked her to take him to town and turn him in, but she called her brother to take him. The appellant told her he had shot John Smith twice. The appellant did not mention Smith having a knife or any weapon, neither did he mention that the gun accidentally fired. In relating her conversation with the appellant, the following transpired:

"A. He told me he had shot Smith.

"Q. All right, did he tell you how many times?

"A. He told me he shot him twice.

"Q. All right, did you ask him for any explanation of why he shot John Smith?

"A. I asked him what happened and he just said they had a round, something like that, something pertaining to that."

James Wilson testified that he was a. first cousin of the appellant and that Jenny Kemp was his sister. He said he lived about three or four thousand feet from Dorothy Bryant's house. On November 24, 1972, he received a call and went home where Thurman Crummie, Jenny Kemp and the appellant were waiting. The witness stated that the appellant had a shotgun at that time. He carried the appellant to the county jail. He further stated that he had never seen the deceased with a knife.

Cecil Simpson, a Tuscaloosa County Deputy Sheriff, testified that he and Deputy Sheriff John Colburn went to the scene of the shooting on the date in question. They found the deceased, John Clay Smith, Jr., lying in a back bedroom wounded. The witness did not see a knife or shiny object around Smith. The officers did not observe a scabbard on the deceased. The witness stated that Smith was still alive at the time he and Deputy Colburn were in the bedroom.

James Ronald Owen, Tuscaloosa County Jailor, testified that the appellant came to the jail on November 24, 1972. He asked the appellant if he could help him, and the appellant replied: "Yes, I believe y'all looking for me. I just shot sombody." The appellant did not mention the gun firing accidentally or that the deceased had a knife.

Bill Hobson, an investigator for the Tuscaloosa County Sheriff's Department, stated that he went to the Bryant home on the date in question. He examined the room of the deceased and did not find a knife or other weapon. He took photographs of the room.

At the conclusion of the State's evidence, the appellant moved to exclude on

grounds that no *corpus delicti* had been proved and that the evidence did not establish a prima facie case of homicide. The trial court overruled, and the defense proceeded with its evidence which was later followed by rebuttal witnesses on behalf of the State.

Deputy Sheriff Prentiss Gardner was asked by defense counsel if he had heard firearms go off in confined areas and whether it would be difficult to tell if one or two shots were fired when a gun goes off once. He said that four or five months earlier, he had heard one shot fired in the county jail that sounded like two shots to him.

Frank Wilson, Sr., testified that he was the father of the appellant. He stated that Dorothy Bryant was his daughter by his first wife and that he knew her reputation in the community for truth and veracity and that it was bad. He stated that his daughter and the deceased were having an affair. He said he knew the reputation of his son in the community for peace and quietude and that it was good. He further testified that the deceased usually carried a dirk or hunting knife and scabbard on his belt.

Jessie Riggs stated that he, his wife and two children, Dorothy Bryant, her daughter and the deceased went to Disney World in Florida, the previous summer. He said Mrs. Bryant and the deceased shared the same motel room for four nights. He stated that the deceased used to carry a small knife and a scabbard on his belt.

Bobby Wilson, brother of the appellant, testified that Dorothy Bryant's reputation for truth and veracity in the community was bad and that she was having an affair with the deceased. Mrs. Francis Tierce, likewise, testified that Mrs. Bryant's reputation for truth and veracity was bad.

Woodford Wilson, also known as James Wilson, testified that he was the appellant's brother. He stated that on the after-

noon of the shooting, the appellant came by his home, stayed about twenty minutes and left. He said the appellant did not take a shotgun with him when he left, but did take two dogs and a hunting vest. He said the appellant appeared normal to him.

Frank Wilson, Jr., the appellant, testified in his own behalf. He stated that he knew John Clay Smith, that Smith was a veteran staying at the home of Dorothy Bryant, the appellant's half-sister. He said his relationship with Smith was friendly. He testified that Mrs. Bryant and Smith were having an affair.

On the day of the shooting, he said he got up early and went deer hunting. After hunting, he went to the Bryant house. Before entering, he put his shotgun in an old automobile standing in front of the house and then went inside. From there, John Clay Smith and Mrs. Bryant gave him a ride to a friend's house. He said their attitude was friendly. Sometime later that afternoon, they picked him up and brought him back to the Bryant house.

On this occasion, he engaged in an argument with Pat Wilson, the white wife of his brother, telling her he did not believe in racially mixed marriages. He said she got mad, and Mrs. Bryant asked him what he did to make Pat cry, and he replied that he had done nothing. He said Mrs. Bryant then ordered him out of the house saying she would have Smith throw him out if he did not leave.

The appellant said he left the Bryant home and drove to his father's leaving his gun in the old car outside the Bryant house. He planned to go rabbit hunting with his brother that afternoon. He walked back to the Bryant house, got the gun from the car, and began unloading it as he walked and reloaded it with another type shot for rabbit hunting. He was hunting as he walked away from the Bryant house, but then decided to return to tell his brother in which direction he was going hunting. He walked through the

Bryant house where he said he was attacked by Smith.

The appellant claims that while walking through the Bryant house, Smith attacked him in a hallway with a knife. He said he hit at Smith with the gun, apparently in self-defense, and it discharged without the trigger being pulled. He said Smith jumped back into his bedroom, then Mrs. Bryant came out of one room and went into another. He knocked on her door, but she did not reply. Since he knew there were other guns in the room where Mrs. Bryant entered, he decided to leave the house. The appellant said he did not know then if he had shot Smith. He said Smith usually carried a hunting knife which had a blade of about nine inches in length.

The appellant testified that he did not touch the trigger when the gun fired and that it fired only one time. He said that he told one of the officers at the county jail when he turned himself in that Smith had a knife at the time of the shooting, and then refused to answer any further questions without an attorney.

On cross examination, the appellant said he had never fired a shotgun or any type gun into his father's house. He said his father had him arrested for public drunkenness or disturbing the peace on an earlier occasion, but not for threatening him with a shotgun. On further cross examination, the appellant stated that he did not beat on the door of Dorothy Bryant's room and threaten to kill her. He testified that he told Thurman Crummie that he had "shot" Smith, not that he had "killed" him. He did not, however, tell Crummie that Smith was coming on him with a knife.

Mrs. Francis Tierce and Bobby Wilson were recalled and both stated that they knew the appellant's reputation in the community to be good. Robert Shirley testified that Dorothy Bryant's reputation for truth and veracity was bad. On cross ex-

amination by the State, the witness admitted that he had been in prison for "making whiskey," and that the appellant's attorney was also the attorney for the witness' son.

The State, next called several rebuttal witnesses. Patricia Riggs testified that Dorothy Bryant was her aunt and that during the trip to DisneyWorld she and Dorothy Bryant and their children slept together in one room, and the men slept in another room.

Dorothy Bryant, recalled by the State on rebuttal, testified that since the shooting the appellant's father had been to her home four times. She said he had talked to her regarding her testimony; on one occasion, telling her that if she did not actually see the shooting, that is all she had to say in her testimony. She said he told her he was going to get enough whites friends and enough money to get the appellant the kind of lawyer needed.

Mrs. Lillie Smith, mother of the deceased, stated that she went to Druid City Hospital where her son was undergoing treatment just before he died. She said Frank Wilson, Sr., came there at her request. She told him she was going to press charges against the appellant. She stated that the appellant's father said he would do what he could to get the appellant off as he was his oldest son.

Bill Hobson was recalled and testified concerning his interrogation of the appellant after the shooting. He established the voluntariness of the statement made to him by the appellant and established that a full *Miranda* warning had been given. He said the appellant stated that he did not want to say anything else until he went to court, but then made additional statements. He testified that the appellant, while in jail, told him that he used a .12 gauge Browning automatic, that it was in the car, and that he had fired twice. He testified that he asked the appellant if Smith had any weapons coming on him and that the appellant said, "No, sir."

On cross examination, the witness said the appellant made an offer to him to give some blood to Smith. He said that during the statement, the appellant said he did not know if he had hit Smith in the stomach, but hoped he had not. On redirect examination, the witness said he examined the scene of the shooting and found no blood in the hall or in the doorway.

Frank Wilson, Sr., was recalled by the appellant and stated that he had never talked with Mrs. Smith at the hospital. He said he did not discuss Dorothy Bryant's testimony with her either. The State and the defense then rested. There was no further motion to exclude the State's evidence at this point. There was no exception to the oral charge of the trial court, but the appellant excepted to the trial court's refusal to give his requested charges.

## I

During the cross examination of the appellant, the prosecution went into the interview of the appellant by Investigator Bill Hobson at the police station, which is in part as follows:

"Q. And you made a statement to him?

"A. I did not make a statement. I told them I didn't want to make one unless I had an attorney present.

. . . . . .

"Q. Told you you had the right to a lawyer?

"A. I told him I didn't want an attorney. Now, he might have told me this, he told me something about the rights of a lawyer.

"Q. And you told him you didn't want an attorney?

"A. I told him I didn't want to say anything unless I had an attorney present, and I don't know what—he told me

something about the law, I can't quote every word he said, 'cause I don't know what he said.

"Q. But he told you—(interrupted)

"A. He told me something about it. Yes, sir.

"Q. All right. But you told him some things there at the County Jail?

"A. I don't know what he got on it. I told them—he told me he wanted—he turned on a tape recorder and told me he wanted my name, age, and address.

"Q. All right. And that was about 4:15 p. m., wasn't it?

"A. Something like that, I don't know.

"Q. Same day of the shooting?

"A. That's right.

"Q. As a matter of fact, at that time and place, didn't you tell Mr. Hobson that you shot him twice?

"A. I told him I think I shot him, I don't know nothing about—(interrupted)

"Q. All right. Let me ask you this, at that time and place, did you tell—did Mr. Hobson ask you this question: 'Do you remember how many times you fired it?'

"MR. THOMPSON: We object to cross-examining any further, Judge. This came after the point when he said he wanted an attorney; he did not want to speak without an attorney.

"THE COURT: Sir?

"MR. THOMPSON: I object, Judge, to the cross-examination concerning any statements made by the defendant here after the defendant stated this, that 'I'd rather not say anything until I have my attorney.'

"THE COURT: I overrule.

"MR. THOMPSON: We except."

The State later recalled Bill Hobson in rebuttal, who established that a proper *Miranda* warning had been given the appellant and that the appellant's statements to him were voluntarily given. The following sequence then occurred without objection on the part of the appellant:

"Q. Would you tell us please sir what that conversation was?

"A. He told me he shot the man.

"Q. All right, sir. Did he go any further than that?

"A. And he said he didn't want to say anything else until he went to Court.

"A. All right, sir. After that did he make any further statements?

"A. Yes, sir, he made several statements further.

"Q. Would you give us those please?

"A. I believe I asked him what kind of gun he shot him with and he said it was a 12 gauge Browning automatic. I asked him where the gun was and he told me that one of the jailers—he told one of the jailers about it being in his car, that he had the gun. I asked him how many times he'd fired the gun. He said twice."

There is some inconsistency between the testimony of the appellant and that of Officer Hobson concerning whether or not the appellant stated that he would rather not make a further statement until after he had talked with an attorney. Officer Hobson's recollection (from his transcription of the tape-recorded interview with the appellant) is to the effect that the appellant said he would rather not say anything further until he went to court. In any event, the appellant, after receiving the *Miranda* warning, made known his desire to make no further statement at that time.

On March 19, 1975, the United States Supreme Court rendered a decision directly in point with the question presented in the instant case. In *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), the appellant had been given a full *Miranda* warning and later told officers he would like to telephone an attorney, but was told that he could not do so until they reached the police station. The appellant then provided inculpatory information, which was not used in proving the State's case in chief, but was used by the State solely for impeachment purposes. The United States Supreme Court granted certiorari in that case, it appears, to clear up any misconstruction of its prior decision in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

In *Harris,* the Court held that an inculpatory statement made by a defendant which could not be used in the State's case in chief due to a failure to give the *Miranda* warning, nevertheless, did not prevent the State from using such inculpatory statement for the purposes of impeachment.

In *Oregon v. Hass,* supra, the Court stated:

"We see no valid distinction to be made in the application of the principles of *Harris* to his case and to Hass' case. . . .

"As in *Harris,* it does not follow from *Miranda* that evidence inadmissible against Hass in the prosecution's case in chief is barred for all purposes, always provided that 'the trustworthiness of the evidence satisfies legal standards.' Again, the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility; again, 'the benefits of this process should not be lost'; and again, making the deterrent effect assumption, there is sufficient deterrence when the evidence in question is made unavailable to the

prosection in its case in chief. If all this sufficed for the result in *Harris,* it supports and demands a like result in Hass' case. Here, too, the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances."

■ We, therefore, hold in the instant case that the trial judge did not err in overruling the appellant's objection to further cross examination concerning statements he may have made after apprising the officers that he wished to make no further statement to them. The appellant's inculpatory statement was not used by the State in its case in chief, but was only used in cross examination of the appellant and on rebuttal for impeachment purposes. Also see: *Roberson v. State,* 53 Ala.App. 472, 301 So.2d 237 (1974).

## II

Frank Wilson, Sr., father of the appellant, testified during the trial that the appellant had a good reputation in the community for peace and quietude. On cross examination by the prosecution, the following occurred:

"Q. Did you not sign a warrant, yourself, for Frank Wilson, Jr. for assault with intent to murder?

"A. I had him arrested. I didn't sign a warrant to that effect, but I did have him arrested.

. . . . . .

"Q. All right. I'll show you a warrant, marked for identification as State's Exhibit 7, and ask you if that's your signature?

"A. That's my signature, yes, sir.

"Q. And you see the wording 'unlawfully and with malice aforethought did assault Frank Wilson with intent to murder him?'

"A. Can I see that? (exhibit is examined by witness and Mr. Thompson.)

"MR. THOMPSON: Judge, let the record show, it's all crossed out, Judge.

"Q. And that you came in later and talked with Mr. Foster and got it settled up in Judge Mayfield's Court, is that not a fact?

. . . . . .

"A. Naw, sir. I haven't talked with him.

"Q. But you did go in and get it changed to another charge in Judge Mayfield's Court.

"A. I haven't went anywhere. I went —only went in after I learnt how it was, when Mr. Warren Miller—(interrupted)

"MR. HARRIS AND MR. FREEMAN: Object, if the Court please, not responsive.

"THE COURT: Sustained.

"Q. But you did sign a warrant for your son?

"A. I signed the warrant.

"Q. And this is your signature?

"A. That's my signature. If I signed warrants for that it was not—he ain't never shot at me, you know, nothing like that."

The State moved to introduce the warrant into evidence, but upon objection, the court disallowed this admission.

During the course of oral argument by the prosecution, the following transpired:

"And he told you that he had his son arrested once for assault with intent to murder, but that he just didn't understand what it was about. He—somebody told him something and he just . . . (interrupted)

"MR. THOMPSON: We object to the statement that he had his son arrested for assault with intent to murder. This is contrary to the evidence.

"THE COURT: All right, sir. The jury will pass upon the evidence."

■ Although the warrant, State's Exhibit 7, was not introduced into evidence, testimony was given concerning the warrant and the charge contained therein. The purpose of the State's cross examination on this point and its offer to put the warrant into evidence was not for the purpose of proving the State's case in chief, but was presented in rebuttal of the witness' statement that the appellant had a good reputation for peace and quietude.

Considering the testimony concerning the issuance of the warrant, hereinabove set out, it would appear that the argument of the prosecution alluding thereto would not be an unreasonable inference to be drawn from that evidence. The witness admitted signing the warrant for his son's arrest, however, the evidence is in dispute as to whether the charge was for assault with intent to murder, and if so, whether the witness had the charge reduced.

■ The prosecution, in its argument to the jury, may make expressions of opinion based upon facts brought out in the evidence, or may point out reasonable inferences or impressions drawn from the evidence. *Brothers v. State,* 236 Ala. 448, 183 So. 433 (1938); *Espey v. State,* 270 Ala. 669, 120 So.2d 904 (1960).

In *Anderson v. State,* 209 Ala. 36, 95 So. 171 (1922), the Alabama Supreme Court set out at length many rulings dealing with improper or prejudicial remarks or argument of counsel. The Court, in part stated:

"Generally, improper argument of counsel to or in the presence of the jury is not a ground for a new trial, or the subject of review on appeal, unless there is prompt and appropriate objection by opposing counsel, a ruling by the court, and exception thereto, or a refusal of the court to rule on the question presented by the objection. . . .

. . .

"The objection or motion must be such as to invoke judicial determination—ruling or action by the court thereon.

. . .

"Where the statement of counsel is only objectionable because of matter of fact not in evidence, the objection and motion should point out the improper statement and separate it from the proper matter of the context. . . .

. . .

"An exception to the general rule requiring appropriate objection or motion invoking corrective instruction or action by the trial court is where the remark or argument of counsel is so grossly improper and highly prejudicial to the opposing party as that neither retraction nor rebuke by the trial court would have destroyed its sinister influence. . . ."

In the instant case, objection was made that the argument was contrary to the evidence, however, no ruling was invoked on the part of the trial court. The court's statement, "All right, sir. The jury will pass upon the evidence," is not a ruling on the objection. Counsel for the appellant did not insist upon a ruling nor object to the failure of the court to rule. Neither was the argument of the prosecution of such a sinister and prejudicial nature as to bring it within the exception to the general rule of requiring a ruling by the trial court and an exception thereto. *Nichols v. State,* 267 Ala. 217, 100 So.2d 750 (1958); *Washington v. State,* 259 Ala. 104, 65 So.2d 704 (1953); *Espey, supra.*

III

We have carefully reviewed the refused charges requested by the appellant.

Charges 1 and 2 are affirmative and properly refused as the State made out a prima facie case. *Morrow v. State,* 52 Ala.App. 145, 290 So.2d 209 (1973).

Charges 4, 5, 7 through 11, 14, 16, 17, 18, 20, 21, 22, 26, 27 through 47, 49 through 71 and 74 all contained propositions of law (though sometimes misstated or ungrammatical) which were correctly, substantially and adequately given to the jury in the trial court's oral charge. Title 7, § 273, Code of Alabama 1940.

■ Charge 6 was abstract and misleading and was not properly predicated upon the evidence in this case, thus properly refused. The subject matter attempted to be covered in that charge was correctly put to the jury by the trial court's oral charge.

Charge 12 refers to charges given at the request of the appellant. None were given, thus such a charge was an incorrect and misleading statement. Charges 15 and 16 were held bad in *Wilson v. State,* 243 Ala. 1, 8 So.2d 422 (1942), and in cases cited therein.

Charge 19 was held to be bad in *Daniels v. State,* 243 Ala. 675, 11 So.2d 756 (1943).

Charge 48 was argumentative · and not predicated upon the evidence in the case in that it assumed the homicide to be an "accident," thus invading the province of the jury. The effect of killing by mere negligence or accident was properly set forth in the trial court's oral charge.

■ Charges 72 and 73 are misleading and abstract where such charges infer that the State's evidence consisted of testimony from a single witness, whereas the State's case consisted of testimony from numerous witnesses. The proper rule concerning credibility of a witness is that the jury may disregard his testimony if they believe it to be willfully false, but where other witnesses' testimony would establish a prima facie case, the jury should not be in-

structed to acquit if they disbelieved the one. A similar charge to 72 and 73 was held bad in *Register v. State,* 34 Ala.App. 505, 42 So.2d 519 (1949). Also see: *Outler v. State,* 147 Ala. 39, 41 So. 460 (1906).

The trial judge gave a very comprehensive charge to the jury which we consider to be outstanding. The record discloses the case to have been fairly tried and the judgment and verdict to be supported by the evidence and the law. The rulings of the trial court, challenged by appellant, did not constitute harmful error.

Affirmed.

All the Judges concur, except CATES, P. J., not sitting.