266 So.2d 609

John WILBANKS

v.

STATE.

5 Div. 648.

Court of Appeals of Alabama.

June 25, 1968.

Rehearing Denied by Court of Appeals
Aug. 13, 1968.

For opinion after remand, see 48 Ala.
Cr.App. 549, 266 So.2d 623, and for opinion
reversing remand opinion, see 266 So.2d
632, and for opinion affirming after re-
mandment, see 266 So.2d 637.

Goodwyn & Smith, Montgomery, Beddow,.
Embry & Beddow, Birmingham, and Geo.
P. Howard, Wetumpka, for appellant.

MacDonald Gallion, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

CATES, Judge.

Wilbanks, tried for the murder of Barbara Lucas King and convicted of voluntary manslaughter, appeals from the judgment and from denial of a motion for new trial. His sentence was for nine years. See Wilbanks v. State, 42 Ala.App. 39, 151 So.2d 741, for former appeal.

Sunday, July 3, 1960, about dusk Barbara Lucas King, nine years old, was killed when the top of the back part of her skull was blown off. She had just lit a firecracker from a cigarette held by her father.

Wilbanks, owner of a sports model Mauser rifle, dwelt the year round on the southern shore of Lake Martin, just east of Castaway Island. Across a slough beside Wilbanks's house stood the cottage of Barbara's father, John L. King.

On Friday, July 1, 1960, Mr. King, his wife and three children drove from Birmingham to spend the weekend at their cottage. On Saturday they were joined by a brother, Mr. Edward King, his wife and two children from Huntingdon, West Virginia.

The State's case is that Wilbanks fired across an arm of the lake while behind his house; in so doing he hit the girl with a soft nose bronze jacketed 8 mm. bullet.

To lead to this result, the State brought evidence tending to show: The rim of three pieces of the rear (occipital) part of the base of her skull put together and shown by a photo (State's Exhibit No. 16A) form an arc, about two-thirds of a circle. That opening Dr. C. J. Rehling, State Toxicologist, testified was "an exact fit of the diameter and path of an 8 mm. bullet."

Dr. Rehling testified that he made a spectographic analysis of the material found around the edge of this hole in the bone of the skull and found lead, antimony, traces of arsenic, copper and zinc. These same chemicals appeared in State's Exhibits 1 and 1A (the test and evidence bullets).

He ran a benzidine test on material removed from these bullets. This test showed blood on the "evidence" bullet. The benzidine test is a blood test, though not differential as between man or beast.

Dr. Rehling's opinion as to the cause of the hole in the child's head was:

"A bullet of eight millimeter (8mm) caliber of very high energy entered the head in the back and made its exist (sic— exit) just within the hair line in front thereby exploding the head."

Sheriff Lester Holley had got to the Kings' cottage about an hour after Barbara died. He found a hole in the outer wall of the cottage. From this hole Deputy Roy Kelly pried two pieces of metal. These pieces, Dr. Rehling testified, were, in his opinion, the remains of a bronze jacketed bullet fired from Wilbanks's rifle.

Putting a fountain pen in the hole from which Kelly had pried the bullet, Rehling

was able, he testified, to project a line which went from the hole to a point where Barbara King was shown to have last stood, then through a gap between pine trees, and continued on thence across the slough to a point behind Wilbanks's house [apparently near some willow bushes].[1] By taking the course and angle of the pen as Dr. Rehling held it, Mr. P. J. Jennings, an assistant county engineer, used a transit to run a hypothetical line of flight from the hole in the wall to the bushes across the slough.

Wilbanks testified that he had not fired his rifle that day; nor had he or his wife seen anyone near the closet where he kept this weapon.

Dr. Rehling fired at least one 8 mm. cartridge with Wilbanks's rifle into a box of cotton. Using a comparison microscope, he lined up the marks on this bullet of lands and grooves with those on the pieces which Deputy Kelly pried from the cottage wall. This view led Rehling to believe that the bullet taken from the wall had the same unique markings as those he found on the bullet fired into the box of cotton.

Mr. King testified that in the late afternoon as he and his brother were sitting outside at the picnic table there was a tremendous explosion.

They went around the cottage, but found no clue to the source of the noise. This search, the State contends, emphasizes the probability of no bullet then being in the wall of the cottage at the place whence Deputy Kelly later pried the two pieces. King testified it was after Barbara's death that for the first time he noticed the hole in the wall. Under cross he changed this. R. 63.

Spattered blood, brains and other human tissue, including small fragments of bone were found on the side and roof of the house as well as on the picnic table and ground.

The State did not directly link Wilbanks with the firing of the gun which killed Barbara Lucas King. The prosecution rested wholly on a chain of circumstances and Dr. Rehling's opinion as to the bullet's path of flight and its being fired from Wilbanks's rifle.

To counter this evidence, Wilbanks produced Mr. C. D. Brooks, a former assistant State toxicologist, now engaged in forensic science investigatory work, and Hon. William Horace Perry, an attorney of Montgomery, an expert in photography.

The opinions of these gentlemen were to the effect that the bullet which killed Barbara Lucas King could have come from a number of places, and that the path of flight projected in Dr. Rehling's opinion was erroneous, or at least was only one of several possible lines.

During examination in chief of witness, Holley, then High Sheriff of Elmore County, the following was recorded by the court reporter:

"A Well, the first thing that I did was introduce myself to him, because I didn't know John, and he introduced himself to me and asked me in. So we went in and sat down and started talking and I told him there what had happened across the point therefrom him, that Barbara, the King girl and been killed, and in my opinion, it was—

"MR. RODERICK BEDDOW: Wait a minute, we object to what his opinion is, please, sir.

"MR. ROBERT ALTON: Is that what you told him?

"THE WITNESS: Yes, sir, I was speaking to John on that.

"MR. RODERICK BEDDOW: We object to what his opinion was, it wouldn't be part of it.

"THE COURT: I understand that he said he was talking to him.

"MR. GLENN CURLEE: In the presence of the Defendant.

"MR. RODERICK BEDDOW: Yes, but he said he told the Defendant that * * *

---

1. Sheriff Holley earlier had testified to doing much the same thing on the night of July 3 after Kelly had pried the bullet pieces from King's cottage wall.

"THE COURT: I will give you an exception, go ahead.

"MR. RODERICK BEDDOW: Yes, but he said he told him about Barbara and about her being killed and that in his opinion, and we are going to object to his opinion, what he said his opinion was, because it calls for irrelevant, illegal, incompetent and immaterial testimony, and it doesn't appear at this stage of his testimony that he is reciting details in connection with the alleged accident, acts done and performed at the time he arrived at the scene of the injury of this child.

"THE COURT: Well, proceed, overrule your objection.

"MR. RODERICK BEDDOW: We except.

"MR. JOE GOODWIN: May I state further some additional ground? Judge, if we are going to allow the Sheriff at this time to testify that he gave John Wilbanks, the Defendant, an opinion at that time, that opinion goes before the jury. If we are going to do that, we might as well let him give his opinion now, it is still an opinion although it was said in front of the Defendant. The Defendant is sitting in Court now, and the Sheriff can't state his opinion on a matter of fact, or conclusion, and we object to it further on that ground.

"THE COURT: Now, let's see, Mr. Goodwin. You have lead up to the Sheriff going over there and he testified he met Mr. Wilbanks and introduced hisself, and now he is asking him what the conversation was.

"MR. JOE GOODWIN: Yes, sir, he is asking the Sheriff what he said to the Defendant, and the Sheriff is attempting to say that I told him that in my opinion something—

"THE COURT: Well, if that was part of the conversation, wouldn't it be admissible?

"MR. JOE GOODWIN: No, sir, I don't think so. I don't think his opinion would be admissible.

"THE COURT: Overrule your objection, go ahead.

"MR. JOE GOODWIN: We except.

"THE COURT: Go ahead, Sheriff.

"A I told him that in my opinion it was done with a high powered rifle, and I asked him if he had one.

"Q Sheriff, let me ask you this, prior to having this conversation who was present there?

"A The two that I told you about, I know that Kelly was, and Sam Cobb and Walter Newman.

"Q All right, was Mrs. Wilbanks there?

"MR. JOE GOODWIN: We object if the Court please and move to exclude his opinion on the grounds that it has not been shown that the Sheriff is an expert and is qualified to testify in his opinion that it was a high powered rifle.

"THE COURT: Overruled.

"MR. GEORGE P. HOWARD: Reserve an exception.

"MR. ALTON, CONTINUING:

"Q. Was Mrs. Wilbanks there?

"A Yes, sir.

"Q All right, sir, did anyone in your presence or hearing make any threat, hold out any hope of reward, or offer any inducement to John Wilbanks prior to having this conversation with him?

"A No, sir.

"Q. All right, sir, continue on with the conversation.

"MR. JOE GOODWIN: We object on the ground that the proper predicate hasn't been laid for any statement made by the Defendant.

"MR. RODERICK BEDDOW: And we don't want this witnesses' bridle just taken off. Mr. Holley doesn't know what's legal testimony and what isn't. We don't want him just turned loose to make any statement he wants to. There has no question been asked him, he has finished with the

other question, he has finished the answer to the other question as I understand it.

"MR. ROBERT ALTON: I asked him to finish the conversation, Judge. If that is all that he had with him he can say that's all.

"MR. GEORGE P. HOWARD: If Your Honor please, it is not shown that anything stated there was in the nature of a confession or admission, or has any relevancy or materiality one way or the other to the case. It may be something prejudicial, we have no way of knowing, and the question doesn't give the Court any help in knowing what he is going to say.

"THE COURT: I believe he has qualified him as to whether there was any inducement, or offer of reward, or hope of reward, go ahead, I overrule your objection.

"MR. GEORGE P. HOWARD: Reserve an exception.

"MR. ALTON, CONTINUING:

"Q Go ahead, Sheriff.

"A What was the question?

"Q What was the rest of your conversation with him after you told him what your opinion was? I believe that was the last thing you said about what happened? What did Mr. Wilbanks say to you, Sheriff, when you told him that Barbara had been killed?

"A He—

"MR. RODERICK BEDDOW: Now, we object to that question on all the grounds assigned to the last question where grounds were assigned, and each ground separately and severally.

"THE COURT: Overruled.

"MR. RODERICK BEDDOW: We except.

"A When I told him that was my opinion, I asked him if he had one of those high powered rifles and he said, 'yes, I have.' I said, 'would you mind letting me see the gun,' and he said, 'no, sir.' I looked at the rifle and then I told him that I was going to have to bring the rifle with me and hold it pending this investigation.

"(Whereupon said rifle was marked as State's Exhibit 2A for identification purposes only.)

"MR. ALTON, CONTINUING:

"Q Sheriff, I show you State's Exhibit 2A, and ask you if that is the rifle that John Wilbanks brought to you at your request?

"A Yes, sir, I would say it's the same rifle.

"Q What did you do with that rifle, Sheriff, after it was turned over to you?

"A I brought it down here and locked it up in the vault that night, and the next morning I turned it over to Dr. Rehling.

"Q Was it in the same condition when you turned it over to Dr. Rehling the next morning as it was when you received it from John Wilbanks?

"A Yes, sir.

"Q Now, Sheriff, after he brought you the rifle, did you have any further conversation with him?

"A No, sir, not until on the day of his arrest.

"(Whereupon said cartridge was marked as State's Exhibit 3A for identification purposes only.)

"(Whereupon said cartridge was marked as State's Exhibit 4A for identification purposes only.)

"MR. ALTON, CONTINUING:

"Q Sheriff, I show you State's Exhibit 4A, and ask you if you have seen that before?

"A Yes, sir.

"Q Where did you first see that?

"A John gave it to me.

"Q Did you have a conversation with him about it?

"A Yes, sir.

"Q Tell us about the conversation you had?

"MR. JOE GOODWIN: Now, if the Court please, we object further on the grounds that no predicate has been laid for a conversation with John Wilbanks.

"MR. ALTON, CONTINUING:

"Q All right, sir where did this conversation take place, Sheriff?

"A The night I got his gun.

"Q Was it part of the same conversation that you previously testified to with John Wilbanks that night?

"A Yes, sir.

"MR. RODERICK BEDDOW: Previously testified to, he hasn't testified to it.

"MR. ALTON, CONTINUING:

"Q Did you previously testify that you had a conversation with John Wilbanks?

"MR. RODERICK BEDDOW: We object to that. He hasn't previously testified in his testimony at this hearing anything about having a conversation with him that night, or hasn't gone into a conversation that he had with him. He went to the house and had a conversation with him and he said he didn't have another conversation with him until the next day of his arrest. I would like to ask the witness some questions—

"THE COURT: Are you asking him about the conversation that he had with him that night with reference to the rifle?

"MR. ROBERT ALTON: Yes, sir. Mr. Beddow said that he hasn't even had a conversation, or hasn't even testified that he had a conversation with him.

"MR. JOE GOODWIN: He just testified that he had no further conversation with him that night.

"THE COURT: That would be a matter for the jury to pass on, go ahead, *overrule your objection.*

"MR. RODERICK BEDDOW: It wouldn't be, Your Honor, pardon me, Your Honor, it wouldn't be a question for the jury to pass on until *they legally get it* and he testified that after he left his house that night when he went there and took the rifle from him, he testified that he never had another conversation with him until the night of the arrest.

"MR. GLENN CURLEE: Your Honor, this is all part of the same conversation he had when he took the rifle up there, and we propose to show that it is the same time when he got the cartridges.

"THE COURT: Got the what?

"MR. GLENN CURLEE: The cartridges that he is holding, almost in the same breath.

"THE COURT: Well, proceed.

"MR. RODERICK BEDDOW: We except.

"MR. ALTON, CONTINUING:

"Q Tell us about the conversation you had about these cartridges, Sheriff?

"MR. GEORGE P. HOWARD: Do we have an objection to that, if Your Honor pleases? If we don't, please give us time to get it in.

"THE COURT: Well, if it is a continuation, gentlemen, of the same occasion he went there, why then I will permit you to show it, but if it is a different time—

"MR. GLENN CURLEE: It is the same time, Your Honor.

"THE COURT: Go ahead then, I will give you an exception.

"MR. GEORGE P. HOWARD: And with the same grounds?

"THE COURT: Yes, sir.

"MR. RODERICK BEDDOW: Your Honor, could I ask Mr. Holley some questions on voir dire? I would like to ask him some questions on his voir dire.

"THE COURT: You may cross examine him if you want to.

"MR. RODERICK BEDDOW: I don't want to cross examine him, I just want to ask him a few questions on his voir dire, about whether or not he had a writ of arrest for this man when he went there, whether or not he talked to him during the conversation that he had with him, whether or not he advised him that he could talk if he wanted to talk and not talk if he didn't want to talk?

"THE COURT: Well, you may examine him along that line. Go ahead, Mr. Alton and finish.

"MR. RODERICK BEDDOW: You say I may examine him now?

"THE COURT: On cross examination and all.

"MR. ROBERT ALTON: He said you could do that on cross.

"MR. RODERICK BEDDOW: I thought I misunderstood you, Judge.

"THE COURT: We are not examining him on whether he arrested him, or what he did that night. He is asking him at this time about the conversation.

"MR. RODERICK BEDDOW: Well, I just wanted to be sure that I made secure this man's rights on that occasion, when a peace officer went there and did not advise him that he was under arrest, and then he took this other thing, this rifle, which, of course, under the law he had no right to do.

"MR. GLENN CURLEE: We object to that and ask that the jury be—

"MR. RODERICK BEDDOW: Let me finish addressing—

"MR. GLENN CURLEE: No, it's too damaging.

"MR. RODERICK BEDDOW: Well, if it's damaging, your witness did it.

"MR. GLENN CURLEE: I would ask that you instruct counsel for the Defense that his statements in the presence of this jury—if he wants to argue it to the Court out of the hearing of the jury, it's all right, but it is prejudicial to this case to let the counsel for the Defense stand there and make the statements that he is making.

"MR. RODERICK BEDDOW: If it's prejudicial—

"THE COURT: If you propose to show here that that is the conversation that he has testified about at this time, and this is the same time and the same place and the same occasion, why I will permit you to do it and you will have your cross examination.

"MR. RODERICK BEDDOW: All right, then, Your Honor, the Court declines to permit me to ask questions on voir dire?

"THE COURT: No, sir, I won't cut you off from any examination, cross examination.

"MR. RODERICK BEDDOW: I don't want to cross examine him.

"THE COURT: I'm ruling that he [meaning Assistant Solicitor] can proceed to examine him with reference to the conversation, and I will give you an exception, Mr. Beddow.

"MR. RODERICK BEDDOW: Let me understand, Your Honor, because I wasn't sure. I thought at first you said for me to go ahead and examine him and he said that you meant on cross examination and then this argument came up. What I want to know is, does Your Honor decline to permit me to question the witness on voir dire now at this point?

"THE COURT: Until he [meaning Assistant Solicitor] finishes, and then you can go into anything that he has examined him on.

"MR. RODERICK BEDDOW: All right, we respectfully reserve an exception, Your Honor.

"THE COURT: All right now, proceed." (Italics added.)

We have quoted this rather lengthy episode in order that it may be applied against

the metewand of two fundamental Alabama principles: (1) the right of the defense to ask for voir dire when incriminatory matter is about to be advanced; and (2) the right under Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, to have the jury withdrawn on the trial judge's hearing of voir dire testimony, particularly as to the voluntariness of the defendant.

 First, as to the various forms of objections, we consider that, in matters impinging on constitutional rights—such as that against compulsion of self-incrimination—the general objection is usually sufficient. Bradford v. State, 104 Ala. 68, 16 So. 107; Amos v. State, 83 Ala. 1, 3 So. 749. Second, as to voir dire on voluntariness of a confession, the Alabama Supreme Court, since Duncan v. State, 278 Ala. 145, 176 So.2d 840, has tended to put the burden on the trial judge, ex mero motu to withdraw the jury, hear the voir dire and expressly rule. Smith v. State, 282 Ala. 268, 210 So.2d 826 (March 14, 1968); Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593.

Moreover, the State's entire case here rested on ballistic opinion evidence brought in via the testimony of Dr. C. J. Rehling. See Wigmore, Note, 25 Ill.Law Rev. 692. The ballistic tests used Wilbanks's own rifle and ammunition which he gave to then Sheriff Holley. The foregoing testimony gives some of the circumstances of his turning these incriminating objects over to the sheriff.

We consider that *Duncan,* supra, is apt in this context as to the sheriff's visit. We quote:

"A person can consent to search without warrant and thereby waive the protection of the Fourth Amendment against invasion of the right of privacy. [Authorities omitted.]

"But courts indulge every reasonable presumption against waiver of fundamental constitutional rights. [Authorities omitted.]

"In United States v. Page [9 Cir., 302 F.2d 81], it was said:

" 'Because of the importance of preserving constitutional rights, various rules have been stated for the guidance of the trial judge in determining whether consent to the search was in fact given. The government must prove that consent was given. It must show that there was no duress or coercion, express or implied. The consent must be "unequivocal and specific" and "freely and intelligently given". There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. * * *' [Authorities omitted.]

"It is said in some cases, among them United States v. Smith, 2 Cir., 308 F.2d 657, as follows: 'When a law enforcement officer knocks at the door, identifies himself, and asks to be allowed to search, the premises, the acquiescence thus obtained is generally not considered to be voluntary consent.'

* * * * * *

"In Knox v. State [42 Ala.App. 578, 172 So.2d 787], the Court of Appeals of this state said:

" '* * * To justify the introduction of evidence seized by a police officer within a private residence on the ground that the officer's entry was made by invitation, permission, or consent, there must be evidence of a statement or some overt act by the occupant of such residence sufficient to indicate his intent to waive his rights to the security and privacy of his home and freedom from unwarranted intrusions therein. An open door is not a waiver of such rights. A peaceful submission to a search or seizure is not a consent or an invitation thereto, but is merely a demonstration of regard for the supremacy of the law. * * *' (172 So.2d 791)"

 Since the defense was denied the right to first have the trial judge alone

hear and rule on the ambient facts of Holley's getting the rifle and cartridges from Wilbanks, the whole trial was rendered unfair by the standards laid down by the Alabama Supreme Court. Taylor v. State, 42 Ala.App. 634, 174 So.2d 795.

Just this month, Mr. Justice Kohn stated in Hubbard v. State, 283 Ala. 183, 215 So. 2d 261 (June 13, 1968):

"This court has long held, as early as 1889 and as late as 1960, that the protection under the Constitution of Alabama is two-fold in regard to the issues here —one protects the defendant from being compelled to *testify against himself*, the other protects the defendant from being compelled from doing any *affirmative act* that may result in the admission of evidence tending to incriminate him. Nothing in the record discloses that the defendant was warned that the *affirmative act* of disrobing himself could result in evidence that could be used against him. Here, it was used against him. * * *"

Hence, under *Duncan, Smith* and *Hubbard*, we are compelled to reverse the judgment of conviction below.

The judgment below is reversed and the cause remanded.

Reversed and remanded.

JOHNSON, J., dissents.

## ON REHEARING

CATES, Judge.

The Attorney General has applied for a rehearing. Wilbanks's counsel has moved that we strike the application.

### I.

Wilbanks's motion to strike is basically grounded on Rule 39 of the Rules of the Supreme Court of Alabama. Motions under this rule cannot be taken up by this court because they are premised on (a) final disposition of an appeal in this court, and (b) the adversary's applying to the Supreme Court for certiorari or "other remedial writ" for the purpose of that court's reviewing the "opinion or decision" of this court.

Clearly, Rule 39 is but a regulation of practice only in the Supreme Court.

The substantive point of Wilbanks's motion is that the Attorney General's application (for rehearing) is deficient:

"1. For that said Application for Rehearing fails to specify the point or decision complained of by the appellee.

\* \* \* \* \* \*

"3. For that said Application For Rehearing fails to inform the appellant of what point or points appellee complains."

These are serious points in view of the importance cast upon the adversary system in appeals by decision of the Supreme Court of the United States in Caton v. Alabama, 392 U.S. 645, 88 S.Ct. 2298, 20 L.Ed.2d 1354 (June 17, 1968), which raises doubt as to the scope of Code 1940, T. 15, § 389. Hence we turn to this court's practice on rehearings.

We follow Supreme Court Rule 34 which reads:

"All applications for rehearing must be filed with the clerk of the court, accompanied by brief for the applicant and a certificate of counsel that a copy of such brief has been delivered or mailed, properly stamped and addressed, to opposing counsel, within fifteen days after the rendition of the judgment whether such period extends beyond the term of the court or not; and such application may be passed upon at any regular or special term of the court. No application shall be received or filed which is not presented

in strict compliance with this rule, and no second application shall be received or filed in any case. Without the order of the court or a justice thereof, the pendency of an application for rehearing shall not stay or suspend the execution of the judgment of the court. No party can as a matter of right apply for a rehearing unless brief was filed with the clerk as provided by the rules."

See De Graaf v. State, 34 Ala.App. 137, 37 So.2d 130, which construed present Rules 9 and 34; also United Security Life Ins. Co. v. Goddard, 42 Ala.App. 629, 174 So.2d 791 (hn. 6).

In *De Graaf,* we find:

" * * * In a brief on rehearing the alleged errors in an opinion should be specifically and clearly called to the court's attention. * * * "

 However, we consider that the State's brief on rehearing is sufficiently pertinent to this court's opinion to avoid the strictures of the *De Graaf* rule. The motion to strike is denied.

## II.

### *On Merits of Rehearing*

Certain of the State's constructions of our opinion on original deliverance do not find support in the text of the opinion. Some may require re-examination in the light of the reasoning used in Bumper v. North Carolina, 390 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (June 3, 1968), particularly that part of the text to which footnote 14 is appended (88 S.Ct. p. 1792).

 The voluntariness of a consent which purports to waive a constitutional right is plainly a matter for *judicial* determination before the jury should go into the subject matter of that which is waived.

Voir dire is the orderly mode for such a proceeding. Its denial was a substantial miscarriage of justice and hence reversible error.

The Supreme Court (July 25, 1968) has denied rehearing in *Hubbard,* 213 So.2d 386. We do likewise here.

Though Wilbanks presses other claims of error upon us, in view of the probability of their not arising in the event of another trial, we forego consideration of these points.

JOHNSON, Judge.

I dissent as to Part II on the merits.

Motion to strike denied; application for rehearing overruled.