369 So.2d 814 (1978)
Billy B. WALKER
v.
STATE.
4 Div. 555.
Court of Criminal Appeals of Alabama.
March 7, 1978.
Rehearing Denied April 4, 1978.
*816 Maury D. Smith, Sterling G. Culpepper, Jr. and Charles S. Coody, of Smith, Bowman, Thagard, Crook & Culpepper, Montgomery, for appellant.
William J. Baxley, Atty. Gen. and David W. Clark, Asst. Atty. Gen., for the State.
DeCARLO, Judge.
Billy B. Walker was indicted by the grand jury of Bullock County and charged with first degree murder in the shooting death of Clifford Richard Hinson.
After a trial by jury the appellant was found guilty of manslaughter in the first degree and sentenced to five years in the penitentiary.
The evidence presented during the trial of the case showed the following:
On the afternoon of September 15, 1976, Dianne Singleton was sitting alone in a parked car across the street from the Bullock County Courthouse. Around five o'clock she saw Clifford Richard (Dickie) Hinson arrive in a car driven by Odell Thomas. According to her the two men parked across the street and got out of the car. She testified that Thomas walked up the street while Dickie Hinson proceeded down the street. Singleton said after seeing the two, she turned and looked into the "Fair Company." Upon looking back she saw the appellant "walk with a gun pointed at Dickie." She recalled that it was about that time she heard a shot and saw Hinson grab himself. When he turned she could see blood on his back.
According to Singleton, Hinson was about eight or ten feet away from the appellant at the time of the shooting. She said that as Hinson grabbed himself with his right hand he said something to the appellant. She testified that Hinson started toward the car he had been riding in and the appellant followed with the gun pointed at him. Hinson staggered then fell on the side of the car.
The appellant appeared to be calm at the time and Singleton said that she did not see anything in Hinson's hand. She saw the man who had been riding with the appellant go over to Hinson, bend for just a second, then go to a car with the appellant.
On cross-examination, Singleton said that she did not notice anything about the way Hinson was walking but did notice that Thomas staggered as he got out of the car. She also said that hearing the shot had not attracted her attention because she was looking at the appellant when he pulled the trigger. Further, she recalled that at the time of the shooting, the two men were not moving toward each other and that Hinson was standing still when he was shot. She could not say whether or not Hinson had a knife but did state that she did not see a knife in his hand.
Blanche Hodge, an employee at E. M. Cohn and Sons, which is located across the *817 street from the courthouse, testified that she had seen the shooting. When she first saw Hinson, he was in front of a car across the street from the store. At a distance of about two or three parking spaces from where Hinson was standing she noticed another car drive up with a man in it. Hodge said that the man got out of the car with a gun in his hand and shot Hinson.
She identified the appellant as being the man who shot Hinson and said that she did not see anything in the victim's hand at the time of the incident. After the shooting, she said that Dickie Hinson stood for a little bit then slumped up against the car and fell to the ground.
Officer Ernest L. Love, a policeman in Union Springs, was working a routine patrol on September, 15, 1976. About 5:01 P.M., he received a telephone call informing him that there had been a shooting at the courthouse. When he arrived he saw Dickie Hinson lying on his back in front of the courthouse. Two other white males were standing a short distance away. He stated that one of the men standing nearby was the appellant and the other was Harry Young.
Love recalled that Hinson had a bullet wound in the chest and lying at his feet was a small pocket knife. He asked who had done the shooting and Billy Walker, the appellant, replied, "I did it." Love then asked where the gun was and was advised that it was in the front seat of the car. He placed the appellant under arrest for attempted murder then went to the car and retrieved the gun. Later he turned the knife and the gun over to Deputy Cole.
On cross-examination, Love said that the appellant did not resist arrest and that he did not smell any alcohol.
Pete Cole, chief deputy of Bullock County, testified that he went to the scene where Officer Love gave him a pistol and a knife. He recalled that the large blade of the knife was open.
During cross-examination, Cole said that he talked to the appellant in the sheriff's office and that he did not appear to have been drinking.
H. O. Williams was the sheriff of Bullock County and testified that on the day of the shooting he was present when certain pictures were taken. He identified those pictures along with the knife and pistol which he had taken to the State toxicologist's office. He also identified a spent bullet which he found in an alley near the place where the shooting had taken place. The spent bullet was taken to the State toxicologist's office also.
Van B. Pruitt, Jr., a toxicologist for the State of Alabama, performed an autopsy on the body of the deceased. He testified that the deceased was five feet, ten inches in height and weighed approximately 220 or 240 pounds. His examination revealed that death was due to a gunshot wound to the chest, causing a massive hemorrhage because of injury to the heart and the hilus of the right lung. Pruitt also said that he examined the clothing of the deceased and did not find any evidence of outer debris, residue or unburned powder particles.
On cross-examination, Pruitt stated that he had conducted a blood alcohol test on the deceased and it showed that the blood contained 0.28 percent ethyl alcohol. Pruitt explained that an individual with such a level of alcohol in his blood stream, "would be clinically and overtly intoxicated."
Tellis D. Hudson was a criminalist with the State Department of Toxicology at Auburn. He testified that on September 16, 1976, Sheriff Williams of Bullock County, delivered a gun to his office which he later test-fired and made comparisons with a bullet that the sheriff had also given him. Hudson said that in his opinion the projectile given to him by the sheriff was definitely fired through the barrel of the weapon that he had received. Further, he said that the maximum range that powder particles would be deposited after the weapon in question was fired was six feet.
The foregoing evidence was all that the State presented in its case in chief. The defendant did not make a motion to exclude but did later make a motion for a new trial which was denied.
*818 The defense called as its first witness, Mrs. Sammy Walker. The witness testified that on September 15, 1976, she was working in the State Food Stamp Office in Union Springs. She said that she had left the office about 5:00 P.M. and was driving north along an alley to the main street. As she neared the sidewalk, Hinson almost stepped in front of her automobile. She said that he was walking north at the time and he threw up his hands as he looked back. While she was stopped for traffic before pulling into the street she heard a shot. She looked back and saw Hinson, "catch his chest." According to Walker, there were two men standing near him.
During cross-examination she said she did not see anything in Hinson's left hand and that she thought he had grabbed his chest with his right hand.
James O. Thomas (Odell), Hinson's cousin, stated that on the day before the shooting, Hinson had spent the night at his house. He said that the following morning they were drinking as they did some work on a pump. He recalled seeing Hinson use a knife while working on the pump. According to Thomas, they finished working on the pump about 2:30 or 3:00 P.M. Thomas stated that they drove to the courthouse and arrived about 4:40 P.M. and after parking the car, Hinson got out and walked to the front door of the courthouse and he, Thomas, walked toward his sister's shop. Thomas said he was in his sister's shop for, "maybe ten minutes," and that he did not see the shooting.
Otis Lewis, on September 15, 1976, was working at Dixie Bullock Hardware Company, which was located north of the courthouse. Lewis testified, "it was a little bit after five o'clock," in the afternoon when he heard a shot. He said that the shot attracted his attention and as he turned he saw this fellow stagger and throw up his hands and subsequently fall backwards to the ground.
During cross-examination, he acknowledged that he did not see any weapon in Hinson's hand.
Billy Byron Walker, the defendant, was in the cattle hauling business. He testified that in July, 1976, Hinson came to work for the business as a driver of one of the two trucks used in the operation. According to Walker, the first time Hinson threatened him was after Hinson had an encounter with some boys at a restaurant. Walker said that Hinson cursed some boys and he told Hinson, "please don't have any trouble in here." When the two men left, Hinson turned and started cursing Walker. Walker said that Hinson told him not to interfere in his business and that if he would get up from the table he would hurt him.
According to Walker a second threat came in the early part of August and he received word of this threat from his partner, Seymore Trammell. Walker testified that a third threat came, "in a little over two weeks before the shooting." It was brought to his attention while he was in Dodge City, Kansas.
He had been accompanied by his ten-year-old son on a cattle hauling trip to Dodge City, and they had seen Trammell and Hinson on the road. Walker said when he confronted Hinson about whether or not he was drinking, Hinson made a cursing remark that he had been and later when he went to the motel where Trammell and Hinson were, Trammell told Walker that Hinson had threatened to kill him.
Walker said when they returned to Montgomery around September 8, 1976, he had gone to Trammell's apartment and Hinson again threatened to kill him.
On Tuesday morning, September 13, 1976, Walker said that Hinson telephoned him and that he understood from the conversation that Hinson was quitting. He explained that Hinson said there were not any problems and that he would give Walker the keys to the truck. Between nine and nine-thirty the same morning, Hinson called again and began to call him names and make remarks about his family. Further, Walker said that within fifteen or twenty minutes Hinson called again and began cursing and threatening him. Walker went on to say that on the night prior to the *819 shooting Hinson again called after midnight and again started cursing him.
Walker testified that on the afternoon of the shooting, Hinson called and after some profanity, agreed to give him the keys to the truck if he would meet him at Hinson's mother's house. Walker said that he suggested that they meet in downtown Union Springs and Hinson agreed.
According to Walker, he and his cousin, Harold Young, went to Union Springs about 4:00 or 4:30 P.M. Walker said that he had a pistol in his pocket and after they parked near the front of the courthouse, he got out and walked up on the sidewalk. He testified that when he stepped in front of the fender of his car, Hinson said to him, "You m-f s-o-b, I'm going to kill you."
Walker said that Hinson was several feet away at the time and after the statement he asked Hinson for the truck keys. At that point, Walker recalled, Hinson said, "here's what you're going to get," and Walker said he saw a knife in his hand. According to Walker, Hinson came toward him like "a wild bull."
Walker stated that he pulled the gun from his pocket and when Hinson continued advancing on him he still hesitated but then fired the gun. He testified that he was shocked and scared and when the shot was fired Hinson was some six to eight feet from him.
After the shooting, Walker placed the gun in the car and later told Officer Love either that "a man had been shot" or, "I shot that man."
Testimony by Lamar Mitchell, Seymore Trammell, Jessie Greer, Roy Greer, and the appellant's wife, Dianne Walker, corroborated that of the appellant.
Approximately thirty-four character witnesses were called and of this number, some twenty-nine testified to the appellant's good general reputation and four testified to the deceased's bad general reputation for being a fighter and a violent person. At the end of the character testimony, the defense rested its case and the State called some six rebuttal witnesses, one of whom, was Sheriff H. O. Williams. The pertinent part of his testimony from the record is as follows:
"Q. Now, let me back up to the date we had the preliminary hearing in this courtroom before Judge Hoffmann, on November the 17th, 1976, which began at approximately 2 o'clock, p. m.
"A. Yes, sir.
"Q. Did you have an occasion to testify at this hearing?
"A. I did.
"Q. Now, I refer you to page ninety-one in said transcript and ask you if Mr. Smith, the defendant's attorney, asked you the question, `You have told us all you know?'
"A. Yes, sir, I remember the question.
"Q. Okay, sir. And I believe Mr. Smith
"MR. SMITH: [Defense counsel] (Interposing) Now, Judge, I object to this.
"THE COURT: Let's hear this out of the presence of the jury. I don't know what you are getting at.
"(THEREUPON, A short discussion was held at the Bench between counsel and the Court out of the hearing of the Jury and Court Reporter.)
"THE COURT: There is nothing for the record, Andy. (Directed to Court Reporter.)
"Q. Sheriff, I'll direct your attention to an earlier time when this question arose and I asked you did Mr. Walker make any statements to you which werewhich you repeated at the Preliminary Hearing.
"A. Yes.
"Q. Under examination by defense counsel?
"MR. SMITH: We object to the question.
"THE COURT: Overruled.
"MR. SMITH: We except.
"WITNESS: Yes, after
"MR. SMITH: (Interposing) May we have a continuing object to this?
"THE COURT: Yes.

*820 "A. After Mr. Tew advised Mr. Walker of his rights Mr. Walker came back in the office where I was and sat down against the wall.
"Q. When was this?
"A. That was the same day of the shooting.
"Q. The 15th?
"A. Yes, sir. He came in and sat down across the desk from me and I asked Mr. Walker what happened and he said, `It was just something that had to be done. It was just something that had to be done.'
"Q. And this is what Mr. Walker said?
"A. This is what Mr. Walker said to me. He continuously repeated this. `This is something that had to be done.'"
"MR. REEVES: Thank you. Your witness."
We note that the record does not reflect any further testimony or objections concerning the appellant's statement made to Sheriff Williams on the day of the shooting.

I
The appellant asserts that prior to the introduction of the foregoing inculpatory statement, the State failed to prove that Walker had been advised of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Appellant urges that the failure to comply with the requirements of Miranda v. Arizona, supra, required the exclusion of the appellant's statement. Further, the appellant maintains that the State's failure to prove that the appellant's statement was made voluntarily, also required exclusion.
The issue is whether an extra judicial inculpatory statement made by an accused can be used for impeachment purposes without proof that the Miranda safeguards were administered and a voluntariness predicate proved.
At the outset, we note that the statement by the appellant was susceptible to two interpretations, the jury could have reasonably understood the appellant's statement in a manner not inconsistent with his version of the shooting.
However, the State's use of the appellant's statement for impeachment purposes indicates that their understanding of the statement's import was that the shooting was premeditated and deliberate.
Generally, where a statement is sought to be used for impeachment purposes by contradicting a statement made by a witness, a predicate must be laid concerning that statement. The content of that predicate after preliminary questioning, would be whether or not the witness had in fact made the statement. A denial would allow the proof of a contradictory statement with the testimony of another witness. Generally, without such a predicate, objections if properly grounded, could not have been overruled without error. Jones v. State, 35 Ala.App. 129, 46 So.2d 229; King v. State, 24 Ala.App. 267, 134 So. 133.
Where only general grounds are assigned as an objection to the impeaching testimony the lower court will not be put in error. The rule stated in Jones v. State, supra, is:
"Where only general grounds are assigned in support of an objection, no error results in overruling it, unless the evidence is illegal for any purpose and cannot be made legal by other evidence, or otherwise framing the question. Wigginton v. State, 17 Ala.App. 29, 87 So. 698; Walden v. State, Ala.App., 36 So.2d 556, certiorari denied 251 Ala. 144, 36 So.2d 558."
See also McElroy's Alabama Evidence, 3rd Ed. 426.01 §§ 8, 9, 10. See also Anderson v. State, Court of Criminal Appeals, 1977, 354 So.2d 1156.
In the case before us, it does not appear that during the appellant's testimony any predicate was laid concerning the statement he made to Sheriff Williams. Without such a predicate the overruling of a properly grounded objection would have been error.
A review of the above quoted portion of the record shows that only a general ground was assigned to the impeaching testimony *821 of Sheriff Williams. Therefore, the lower court was not in error in overruling the appellant's objections when buttressed only by general grounds.
Although we hold that it was insufficient to challenge this impeaching testimony on general grounds, we must analyze the admission of the statement in the light of whether it can be used without a showing of the Miranda safeguards and proof of a voluntariness predicate.
We note that the prosecution in its case in chief may not use statements given by an accused while in custody before a predicate is laid demonstrating that procedural safeguards under Miranda have been met and that the statement was voluntarily made. However, under Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, a statement otherwise inadmissible during the prosecution's case in chief because of violation of procedural safeguards, is properly admitted for impeachment purposes where it satisfies legal standards of trustworthiness. The court in Harris v. New York, supra, commented:

". . . Miranda barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from Miranda that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."
Walker admitted to Officer Love within minutes after the shooting that he had done the shooting. In his testimony he states that he told the officer that a man had been shot or either that he had shot the man. During his testimony, Walker stated that the deceased was the aggressor and that the shooting was an act of self defense.
The record clearly indicates that the statement made to Sheriff Williams was not used in developing the prosecution's case in chief, but came after the appellant had given testimony that the shooting was done in self defense. Under these circumstances, the State could show for impeachment purposes, the content of the appellant's statement. See Roberson v. State, 53 Ala.App. 472, 301 So.2d 237; Wilson v. State, 56 Ala. 13, 318 So.2d 753.
The appellant also maintains that the State's failure to affirmatively show that the appellant's statement was voluntarily made requires a reversal. We recognize that extra judicial statements are prima facie involuntary and the duty rests on the trial judge to determine at the outset that the confession was, in fact, voluntary. Such a confession or inculpatory admission can only be used after proof of a voluntariness predicate. In Greer v. State, 36 Ala. App. 522, 60 So.2d 358, the court stated when facts and circumstances attending the confession clearly show that it was made without fear or hope of reward, then the necessity of laying a formal predicate is not required.
In Greer v. State, supra, this court followed the earlier case of Sullins v. State, 53 Ala. 474, in which our Supreme Court held:
"`Before the confessions of the accused, or admissions made by him, can be received as evidence against him, it must appear to the court that they were voluntary, not constrained. Though made to the officer arresting him, or to the magistrate before whom he is carried for examination; or made in answer to inquiries propounded by either officer; and though neither has cautioned or warned him against confessing; if, on a consideration of all the circumstances surrounding him when made, they do not seem to have been influenced by the appliances of hope or fear, from others.'"
See Cline v. State, 25 Ala.App. 533, 148 So. 172.
The facts in the case before us reveal that the appellant had been advised of some rights before he went in to talk with the sheriff. The colloquy cited above does not show the coercive atmosphere criticized in Miranda, supra. On the contrary, shows that it was in a relaxed atmosphere. The appellant was sitting across the desk from the sheriff, and from aught that it appears, *822 they were alone at the time. The statement, when made, was in response to the sheriff's question, "what happened?"
These facts seem to negative the existence of any coercive influence and the statement does not seem to have been influenced by any hope or fear from others.
Under the rationale in Greer v. State, supra, the statement was properly admitted without a former predicate of voluntariness. This would certainly be true where the statement is used for impeachment purposes and not in the prosecution's case in chief.

II
In the trial court's oral charge to the jury on reasonable doubt, it gave the following example.
". . . I had a friend one time, and I give this example, and I think it is a good example; he is dead now but he was a good friend of mine, and most of these lawyers here at the table knew him, and they probably know who I'm talking about when I describe him. He was the Devil's advocate kind of fellow. He always took the other side of an argument because he liked to argue. He would never answer a question. He would ask you a question back. He could see a doubt in any situation that you could think of. You could be riding down the road and pass a Black Angus farm and it could have a sign, `Registered Black Cows,' and you could see Black Angus cows in every direction and you would pick one out and point to it and say, `That is a pretty Black Angus cow, isn't it?' and he would say, `Well, it is on this side.' He wouldn't agree with you unless he walked all the way around to see it wasn't spotted on the other side. Now, that is not a reasonable doubt. That is a doubt you have to force yourself to see and strain at. That is not the kind of doubt that the State has the burden of removing because the State couldn't remove that kind of doubt if you wanted to see a doubt."
At the end of the court's entire oral instruction to the jury, the defense counsel made the following exception.

. . . . .
"MR. SMITH: I want to respectfully except to the Court's instruction in referring to the example of the friend, which you say is now deceased, and that he could see a doubt in every situationto the illustration of a black cow and it was stated by the Court that would not be a reasonable doubt. I just state to the Court that it would apply, that you could find a doubt in every situation.
"THE COURT: You can?
"MR. SMITH: And under the circumstances would imply to the jury that there was no doubt about the guilt of this defendant in some degree of homicide.
"THE COURT: All right. I note your exception."
The appellant complains that this example of reasonable doubt concerning the black angus cows improperly invaded the province of the jury. He maintains that when taken in conjunction with the court's statement; "That is not the kind of doubt that the State has the burden of removing because the State couldn't remove that kind of doubt if you wanted to see a doubt," would imply to the jury that real doubt which is based on the evidence need not be removed by the State.
Counsel argues such charges are improper because they are misleading and they serve to "denigrate the evidence which defense raises." Further he submits that the charge oversteps the bounds of neutrality and says to the jury that the evidence presented by the defense must be seen only in the light of the court's example. Counsel insists it was an improper comment on the evidence and that a reversal is required.
In King v. State, 17 Ala.App. 536, 87 So. 701, this court in defining reasonable doubt said:
"`It must be borne in mind that the judge, a human being, was endeavoring to make clear to the jury, 12 other human beings, just what was the real, every day, *823 all the year around, meaning of those two words `reasonable doubt,' which have been the cause of so much confusion and misunderstanding. Being fully aware that in the whole domain of knowledge mathematical facts alone are capable of that precise and logical demonstration which absolutely convinces the mind and leaves no room for any doubt whatever, it was well that the judge should charge the jury that the guilt of the defendant could not be established to a mathematical certainty. When one has solved a given problem in geometry and has demonstrated the correctness of his solution by applying to it the rules of that science and the knowledge which he already possesses, the certainty of the facts involved has been demonstrated by a chain of facts and argument which must completely convince the mind of every sane man. Such a demonstration not only convinces the mind of the truth of a proposition, but absolutely excludes the possibility that a contradictory proposition is true. But, as regards our knowledge of human affairs derived from the testimony of witnesses, this is absolutely impossible. Such facts cannot be scientifically demonstrated to be true, and it strikes us as a perfectly safe rule that the certainty required of the jury might safely be arrived at by weighing and considering the testimony as they weigh the everyday affairs of life, to the certainty, of course, that they should be satisfied beyond a reasonable doubt of the guilt of the accused, and this reasonable doubt being a substantial doubt arising out of the evidence. A reasonable doubt is a doubt for which a reason can be given."
The Supreme Court in Wright v. State, 148 Ala. 596, 42 So. 745, which was reversed on other grounds, held that the following portion of an oral charge on reasonable doubt was good:
"`The court charges the jury that a doubt to justify an acquittal, must be reasonable. It must be an actual and substantial doubt, not a mere possibility or speculation. A reasonable doubt is not a mere possible doubt, because most things relative to human affairs and depending on moral evidence is open to some possible or imaginary doubt.'"
See Jimmerson v. State, 133 Ala. 18, 32 So. 141; Gregory v. State, 148 Ala. 566, 42 So. 829; Hall v. State, 54 Ala.App. 198, 306 So.2d 290.
We recognize it is difficult to explain to the jury what reasonable doubt is, and we recognize, as the court did in King v. State, supra, that guilt cannot be established to a mathematical certainty and, beyond all doubt.
The burden resting on the State is to prove the defendant guilty beyond a reasonable doubt and not beyond every doubt. The doubt which would justify an acquittal must be an actual one, not a mere possibility or speculation.
Although we recognize that you can find a doubt in every situation, the doubt that the law says will cause the minds of the jury to acquit, is a doubt for which a reason exists. Hall v. State, supra. The reasonable doubt that the law speaks of is that doubt which is generated in the mind of the juror after he weighs and considers the testimony in the same manner that he would weigh and consider the everyday affairs of his life. If, after such consideration, the doubt remains, it is then a doubt for which a reason exists.
In the present case, the example given by the trial judge, informed the jury that the doubt they were to consider was that doubt that remained with them after they had weighed and considered the facts in the same manner that they would weigh and consider the matters of their everyday life.
This example cannot be considered misleading or improper when examined with the court's preliminary instructions on reasonable doubt.
The oral instructions preceding this illustration were as follows:
"Well, what do we mean when we talk about a reasonable doubt? I think it is self-explanatory. And I think sometimes *824 when we start trying to explain a reasonable doubt we confuse it. But, it might help you to say that a reasonable doubt, the kind of doubt that would justify an acquittal, must be an actual, substantial doubt. Not a mere possible doubt. A reasonable doubt is not a mere guess or a forced kind of doubt. If after considering all the evidence in the case you have an abiding conviction in your heart of the guilt of the defendant, then you have been convinced beyond a reasonable doubt and it would be your duty to find him guilty. If, on the other hand, there is not that abiding conviction in your heart of his guilt, then the State has not met its burden of proof and it would be your duty to acquit the defendant.
"`The reasonable doubt that entitles the defendant to an acquittal is not a fanciful, vague, speculative doubt, but a reasonable, substantial doubt arising from the evidence, or lack of evidence, and remaining after a careful consideration of the testimony, such as reasonable, fairminded, and conscientious men would entertain under all the circumstances.
"Now, I say again, the kind of doubt that would justify an acquittal is an actual substantial doubt. The State does not have the burden of removing all doubt. It has to convince you beyond a reasonable doubt because an active mind can see a doubt in any situation you want to name."
In our judgment, the example was sound when considered with the court's entire oral charge and its utilization was not error.
We have examined the record and have found no error.
AFFIRMED.
TYSON, J., concurs.
HARRIS, P. J., concurs in result,
BOOKOUT and BOWEN, JJ., dissent.
BOOKOUT, Judge, dissenting:
In Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) the Supreme Court reaffirmed its holding in Harris v. New York. In Harris, supra, the Miranda warning was defective. In Oregon v. Hass, a full Miranda warning was given, but questioning continued after Hass requested an attorney. The defendants' statements in both cases were allowed only to impeach their earlier testimony. However, Oregon v. Hass recognized that the standards of voluntariness must still be met before an inculpatory statement may be used, even for impeachment purposes. The majority opinion recognizes this to be the law. However, we differ on (1) whether a general objection is sufficient to raise the failure to lay a proper predicate, and (2) whether the appellant's statement was shown to be voluntary.
The Alabama Supreme Court held that a general objection was sufficient to raise the question that no specific proof of voluntariness had been presented, in Bradford v. State, 104 Ala. 68, 16 So. 107 (1893), and Amos v. State, 83 Ala. 1, 3 So. 749 (1887). Those cases were the basis of authority for this court to reverse the conviction in Brown v. State, 42 Ala.App. 125, 154 So.2d 758 (1963) where only a general objection was made. All of those cases state, in effect, that an extra-judicial inculpatory statement of a defendant is prima facie inadmissible until the trial court, proceeding with great care, determines from evidence presented that the statement is voluntary.
This court likewise cited Bradford and Amos, supra, in Wilbanks v. State, 48 Ala. App. 540, at 547, 266 So.2d 609, at 616 (1968)[1] in stating:
". . . as to the various forms of objections, we consider that, in matters impinging on constitutional rightssuch as that against self-incriminationthe general objection is usually sufficient. . . ."
The absence of evidence in the record that appellant was induced to make his statement to the sheriff is insufficient to establish voluntariness of the statement.
*825 That the appellant had been advised of "some rights," that he was alone with the sheriff, and that the atmosphere was relaxed, does not meet the standard of proof necessary to show that the statement was voluntary. Likewise, the circumstances under which the instant statement was made are distinguishable from those set out in Greer, supra, in the majority opinion.
To quote from Amos, supra:
". . . The record is silent as to what caused this confession, or called it out. Inducements or fear may have preceded the confession, and there is nothing in the record to show that they were not brought to bear upon him. It has been too long the rule of this court to be now disputed or questioned, that `all confessions are prima facie involuntary and inadmissible, and they can be rendered admissible only by showing that they are voluntary and not constrained.' . . ." (Citations omitted.)
The statement by appellant that, "It was just something that had to be done. It was just something that had to be done," could possibly be considered as supportive of his defense of self-defense. The very nature of that defense is that the killing was necessary, or that it had to be done in order to prevent the appellant from suffering death or grievous bodily harm.
Yet, we do not wear blinders when considering a case. It is obvious that the State did not introduce the appellant's statement for the purpose of bolstering his self-defense testimony. The State called Sheriff Williams as a rebuttal witness. It put forth the appellant's statement to Williams to rebut the appellant's claim that he acted in self-defense. The purpose of offering the statement and its probable effect upon the jury was adverse to appellant, as being inculpatory in nature. It therefore should not have been put before the jury without having first been proved to be voluntary. I therefore respectfully dissent.
BOWEN, J., joins in this dissent.
NOTES
[1] Reversed by Alabama Supreme Court on other grounds, 289 Ala. 166, 266 So.2d 619 (1969).